**UNITED STATES of America,**
**Plaintiff,**

v.

**Gifford A. PIRNIE et al., Defendants.**
**Civ. No. 1519 L.**

United States District Court,
D. Nebraska.

Feb. 17, 1972.

Arnold J. Grundeman, Fairway, Kan., and Robert J. Becker, Omaha, Neb., for plaintiff.

Jack W. Meyer and Paul M. Conley, Lincoln, Neb., for defendants.

## MEMORANDUM OF DECISION AND FINDINGS OF FACT

URBOM, Chief Judge.

Under the provisions of 28 U.S.C. § 1345 the plaintiff seeks judgment against the defendants Gifford A. Pirnie and Lillie Pirnie for amounts due on several loans advanced through the Farmers Home Administration, sometimes referred to herein as FHA, all secured by personal property of the defendants Pirnie. Substantial amounts of the secured property have been sold by Frank Weander, Jr., doing business as Ainsworth Livestock Market, and the Valentine Livestock Auction Company. Frank Weander, Jr. and the Valentine Livestock Auction Company initially were named as defendants, but upon their paying into the registry of the court the amounts realized from the sales they have been dismissed from the action.

## FINDINGS OF FACT

On February 16, 1965, the defendants Gifford A. Pirnie and Lillie J. Pirnie, for value received, executed and delivered to the plaintiff their promissory note in the principal sum of $31,010.00, with interest thereon at the rate of five per cent per annum from March 26,

1965, until paid. There is now due and owing on said note the principal sum of $20,095.79, with interest to February 3, 1969, in the amount of $1,275.70 · and a daily interest accrual rate from that date of $2.7528.

On March 25, 1966, for value received, the defendants Gifford A. and Lillie J. Pirnie executed and delivered to the plaintiff their promissory note in the principal sum of $5,020.00, with interest thereon at the rate of five per cent per annum from April 11, 1966, until paid. There now is due and owing on said note the principal amount of $2,117.51, plus interest through February 3, 1969, in the amount of $143.59 and interest accruing thereafter at the daily rate of $.2901.

On February 10, 1967, the defendants Gifford A. and Lillie J. Pirnie, for value received, executed and delivered to the plaintiff their promissory note in the principal amount of $8,660.00, with interest thereon at the rate of five per cent per annum from March 10, 1967, until paid. There now is due and owing on said note the principal amount of $8,633.84, plus interest in the amount of $627.13 through February 3, 1969, and interest from that date at the daily rate of $1.1827.

On May 26, 1967, the defendants Gifford A. and Lillie J. Pirnie, for value received, executed and delivered to the plaintiff their promissory note in the principal amount of $900.00, with interest thereon at the rate of five per cent per annum from June 27, 1967, until paid. There now is due and owing on said note the principal amount of $900.00, plus interest accrued through February 3, 1969, of $61.03 and interest accruing thereafter at the daily rate of $.1233.

As security for the above said promissory notes the defendants Gifford A. and Lillie J. Pirnie executed and delivered to the plaintiff crop and chattel mortgages dated April 2, 1965, and June 18, 1965; security agreements dated April 14, 1966, and March 21, 1967; and a financing statement filed for record March 25, 1966, with the Cherry County Clerk. All of the above security instruments were properly perfected.

The plaintiff is the owner and holder of the previously mentioned promissory notes and security instruments.

The security agreement executed by the defendants Gifford A. and Lillie J. Pirnie on April 14, 1966, contained the following clauses:

"All livestock, fish, supplies and other farm products including those in inventory, now owned or hereafter acquired by Debtor, together with all increases, replacements, substitutions, and additions thereto, including but not limited to the following: (Itemized list followed)

"All farm and other equipment now owned or hereafter acquired by Debtor, together with all replacements, substitutions, additions, and accessions thereto, including but not limited to the following: (Itemized list followed)

"DEBTOR WARRANTS, COVENANTS, AND AGREES THAT:

\*      \*      \*      \*      \*      \*

"B.   .   .   Debtor will (1) use the loan funds secured hereby for the purposes for which they were or are advanced, (2) comply with such farm and home management plans as may be agreed upon from time to time by Debtor and Secured Party, (3) care for and maintain the collateral in a good and husbandlike manner, .   .   . (6) not abandon the collateral or encumber, conceal, remove, sell or otherwise dispose of it or of any interests therein, or permit others to do so, without the prior written consent of Secured Party, .   .   .

"C. Debtor will pay promptly when due all (1) indebtedness secured hereby, (2) rents, taxes, insurance premiums, levies, assessments, liens, and other encumbrances, .   .   . and other charges now or hereafter attaching to, levied on, or otherwise pertaining

to the collateral or this security interest, . . .

"D. If Debtor fails to pay to third parties when due any amounts as required by this Agreement, they may be paid by Secured Party and shall thereupon be secured hereby, bear interest at the rate borne by any note or other instrument described above, as Secured Party determines, and shall be immediately due and payable by Debtor to Secured Party without demand at the place designated in said note or other instrument.

"IT IS FURTHER AGREED THAT:

\*   \*   \*   \*   \*   \*

"B. Upon default hereunder (whether by failure to pay promptly any indebtedness hereby secured or to observe or perform any covenants or agreements herein contained, . . .

"1. Secured Party, at its option, may (a) declare the entire indebtedness secured hereby immediately due and payable, (b) enter upon the premises and take possession of, repair, improve, use, and operate the collateral . . . for the purpose of protecting or preserving the collateral or this lien, or preparing or processing the collateral for sale, and (c) exercise any sale or other rights accorded by law.

"2. Debtor hereby . . . (b) waives all notices, exemptions, compulsory disposition and redemption rights. . . .

"C. Proceeds from disposition of collateral shall be applied first on expenses of retaking, holding, preparing for sale, selling and the like . . . second to the satisfaction of indebtedness secured hereby, . . . and fifth to Debtor. . . . Debtor will be liable for any deficiency owed to Secured Party after such disposition of proceeds of collateral . . ."

The other security agreement and the crop and chattel mortgages all contain clauses to similar effect.

In September, 1967, Pirnie and his family moved from ranch land he was renting from Wallace O. Hamit in Cherry County, Nebraska, to Ainsworth, Nebraska, in Brown County. He left his livestock and machinery on the Hamit ranch in Cherry County initially under the care of his son. In October, 1967, Pirnie advised the county supervisor that he had a buyer for 100 of his cows and for various pieces of farm machinery and equipment. The proposed buyer was John Samuel Spitler, and in October, 1967, Spitler, Pirnie and the plaintiff's county supervisor met, discussing the proposed sale. The sale to Spitler never was consummated; failure to consummate was not a result of any action of the plaintiff.

On about October 11, 1967, the plaintiff's county supervisor told Pirnie that unless his chattel property was sold or in the process of sale within the next sixty days, he would have to have a complete liquidation sale and close out his FHA account.

On October 16, 1967, Pirnie was mailed a form letter notice signed by the county supervisor, advising him that he was delinquent in his payments on his FHA account and requesting that payment of the amount due on November 1, 1967, be made on November 1, 1967.

No payments were made to the Farmers Home Administration on or prior to November 1, 1967, in response to that notice.

On November 24, 1967, the county supervisor sent a letter by first class mail to Pirnie suggesting that he close out his supervised account and apply that amount on his debt with the Farmers Home Administration, informing him that approximately $10,000.00 was still due on his account for 1967 and that the longer he delayed in settling his account the more costs he would incur. He further suggested that Pirnie pay the balance of his Farmers Home Administration account. This letter was not returned to FHA.

On about November 22, 1967, Pirnie complained to the state FHA office by

telephone that the county supervisor was forcing him to sell his cattle.

Other contacts were had with Pirnie prior to December 31, 1967, the collective tenor of which could only be construed as a demand upon Pirnie to liquidate his FHA account.

Prior to January 2, 1968, the defendant contacted Frank Weander, Jr., the owner of the Ainsworth Livestock Market, and requested that he visit Pirnie's ranching operation to inspect Pirnie's livestock. Weander, in company with the defendant, inspected livestock located on Pirnie's operation in Cherry County, Nebraska. An agreement was reached between Pirnie and Weander that the livestock would be consigned to the Ainsworth Livestock Market for sale on January 5, 1968. The plaintiff had not contacted Weander or the Ainsworth Livestock Market for the purposes of this sale at or prior to January 2, 1968.

On or before January 2, 1968, 189 cattle and 16 dairy cows were delivered to the Ainsworth Livestock Market by Pirnie for the purpose of sale, and Pirnie advised the FHA office on or about January 1, 1968, that his cattle were at the Ainsworth Livestock Market and would be sold on January 5.

On January 2, 1968, Weander contacted the plaintiff regarding Pirnie's sale and was advised of the plaintiff's lien on Pirnie's cattle. Weander was requested to make the check for the proceeds of the sale jointly to Pirnie and the Farmers Home Administration.

The only connection the plaintiff had with the sale at the Ainsworth Livestock Market on January 5, 1968, was to agree in a conversation with Pirnie on about January 2, 1968, that the sale could take place and to inform Ainsworth Livestock Company of the plaintiff's lien on those cattle and request that the check be made payable jointly to FHA and Pirnie. The plaintiff also consulted with the county treasurer for the purpose of paying the defendants' personal property taxes so that no tax lien would be placed against the cattle at the time of sale.

On January 5, 1968, a sale was held at the Ainsworth Livestock Market in Ainsworth, Brown County, Nebraska, and 189 head of cattle were sold at that time by Gifford Pirnie at public auction for the net amount of $23,172.35. All of the 189 head of cattle sold at the sale barn on January 5, 1968, by Pirnie were branded with Pirnie's brand, were the property of the defendant Gifford Pirnie, and were subject to the security instruments of the United States. Pirnie was present at the time of the January 5, 1968, sale and did not protest the price obtained for the livestock. The sale at the Ainsworth Livestock Market on January 5, 1968, was well advertised and was well attended by prospective buyers. The prices obtained for the cattle sold by Gifford A. Pirnie on that date represented the fair market value of that livestock.

Of the cattle delivered to the Ainsworth Livestock Market by Pirnie for sale, 19 milk cows and calves were not sold. The sale of such cattle was delayed to allow them to gain weight.

After the sale of January 5, 1968, at the Ainsworth Livestock Market, the plaintiff demanded that Pirnie turn over the proceeds of that sale to plaintiff. Pirnie did not comply with that demand.

On January 18, 1968, the county supervisor orally urged Pirnie to sell the remainder of his security and apply the proceeds therefrom on his account because he no longer qualified for an FHA loan.

Prior to February 1, 1968, Pirnie ceased to care properly for his cattle and machinery on the Hamit Ranch in Cherry County to such an extent that the security interests of the government were or might have been impaired.

On March 4, 1968, a letter was sent to the defendant Gifford A. Pirnie by the plaintiff's county supervisor, demanding payment in full of his operating loans and advising him that if payment in full was not received, legal action would be undertaken. This letter was sent by certified mail. Pirnie refused to accept

this letter on March 5, 1968. On March 6, 1968, the plaintiff's county supervisor requested that the certified letter be returned. After return, he sent the letter to the defendants Pirnie by regular first class mail.

On April 12, 1968, a letter was mailed to Pirnie demanding payment in full by the Nebraska state office of the Farmers Home Administration by certified mail. This letter was returned to the plaintiff unclaimed.

Prior to June 1, 1968, proper demand had been made upon the defendants Gifford A. Pirnie and Lillie J. Pirnie for payment in full of the Farmers Home Administration account.

On June 3, 1968, an action was heard in front of Judge Harold D. Jordan of the Cherry County Court for the State of Nebraska in the case of "Wallace O. Hamit and Isabelle J. Hamit v Gifford Alvin Pirnie and Lillie Pirnie," requesting a writ of restitution of the Hamit ranch. Judgment was entered on June 3, 1968, giving Hamits restitution of the premises, generally known as the Hamit Ranch in Cherry County, Nebraska, and ordering the sheriff of Cherry County to remove from said premises the defendants Pirnie and to restore the same to the plaintiffs Hamit. This writ was executed by the sheriff between June 4, 1968, and June 13, 1968, by having the personal property of Pirnie removed. Pirnie was not present on the Hamit property and, therefore, the personal property, consisting of livestock and equipment, was delivered to the Farmers Home Administration by virtue of its security instruments.

The plaintiff took possession of the personal property of the defendants Gifford A. Pirnie and Lillie J. Pirnie under the provisions of the writ of restitution and caused that personal property to be delivered to the Valentine Livestock Auction Company at Valentine, Cherry County, Nebraska, for sale.

On the afternoon of June 20, 1968, 26 cattle, 5 horses, and miscellaneous machinery and cattle property were sold by the Valentine Livestock Auction Company at public sale for the net amount of $5,944.18. All of the cattle sold carried the brand of Gifford A. Pirnie and Lillie J. Pirnie.

All of the personal property and livestock sold at the Valentine Livestock Auction Company on June 20, 1968, described above and in plaintiff's Exhibit 35, was subject to the security interest of the United States. The value received for that property in the net amount of $5,944.18 was the fair market value of that property at the time of sale. The sale of Pirnie's personal property at the Valentine Livestock Auction Company was advertised in the Valentine newspaper of June 13, 1968, and June 20, 1968. A copy of the advertisement of June 13, 1968, and a letter advising Pirnie that the hay remaining on the ranch would be sold privately was mailed to Pirnie by certified mail on June 14, 1968. This letter was refused by Pirnie and returned to the plaintiff.

The plaintiff incurred expenses in the amount of $333.01 in the servicing, advertising, and delivery of the defendants' property to the Valentine Livestock Auction Company in preparation for the sale of June 20, 1968. Of this amount, the principal amount of $83.24 and interest of $2.07 accrued through February 3, 1969, with a daily interest accrual rate from that date of $.0114, have yet to be paid.

No waiver of any security interest or any right of the plaintiff has been made by the plaintiff.

Through February 16, 1972, the defendants Gifford A. Pirnie and Lillie J. Pirnie are indebted to the plaintiff in the principal amount of $31,830.38, plus interest through that date of $6,940.73.

All of the property referred to in the plaintiff's complaint which was sold at the Ainsworth Livestock Market on January 5, 1968, and all of the property which was sold at the Valentine Livestock Auction Company on June 20, 1968, was subject to the security interest of the plaintiff.

In accordance with the provisions of the security agreement, the plaintiff accelerated the account and declared the entire amount due and payable prior to June 20, 1968.

No malfeasance, misfeasance, or nonfeasance on the part of the plaintiff or its agents deprived the defendants Pirnie of any of the profits they might have realized from normal ranch operation in which they were engaged or left the defendants Pirnie destitute or otherwise damaged.

## DISCUSSION

*The January 5 sale.*

Substantially before January 5, 1968, the plaintiff informed Gifford A. Pirnie that he no longer met the requirements for retaining his loan and told him that he would have to pay his account in full or liquidate his operation. The provisions of 7 C.F.R. 1871.22(a) (1968) are:

"[L]iquidation action will be undertaken when . . . it is determined that no further assistance will be given to a borrower and when one or more of the conditions set forth below exist. . . . When liquidation action is taken, it is the policy to liquidate all security property or so much thereof as is necessary to pay the Farmers Home Administration indebtedness in full.

"(1) A borrower is delinquent and his refusal or inability to pay on schedule, or as agreed upon, is due to lack of diligence, lack of sound farming operations, or other circumstances within his control.

"(2) A borrower whose loan was made with the expectation that he would operate a farm, ceases to farm and voluntary liquidation can be accomplished.

"(3) A borrower is in default by . . . not properly caring for security property to such an extent that the security interests of the Government are or may be impaired, . . . or by some other action which resulted in bad faith in connection with his loan."

As indicated in the findings of fact, Pirnie was not properly caring for the security property to such an extent that the security interests of the government were or might be impaired and he was not using sound farming operations. Liquidation, accordingly, was authorized. The sale of January 5, 1968, however, was voluntary on the part of Pirnie. Although under some pressure from the government to liquidate, the January 5 sale was arranged by Pirnie, and not by the government. Even if the sale barn conducting the sale was not authorized to make the sale, as Pirnie claims it was not, the result cannot be a withholding of the proceeds from the United States.

As shown by the findings of fact, I am persuaded that the preponderance of the evidence is that all the cattle sold at the January 5 sale belonged to Pirnie. All were branded with his brand and he claimed title and authority to sell the cattle at the time he delivered them to the sale barn. Sections 54–103 and 54–109, Nebraska R.R.S.1943, provide that where title to animals is an issue, the brand or mark is prima facie evidence of ownership of that animal in the person who owns the brand or mark. No satisfactory evidence contradictory to that prima facie evidence has been shown by the defendants.

Item 2 of the April 14, 1966, security agreement granted a security interest to the United States in "All livestock . . . now owned or hereafter acquired by Debtor, together with all increases, replacements, substitutions, and additions thereto . . . ." The Uniform Commercial Code became effective in the State of Nebraska at midnight on September 1, 1965. Section 10–101 U. C.C., Nebraska R.R.S. The last three of Pirnie's loans and the security agreements were executed and perfected subsequent to that date. The future advance clause in the security agreements is recognized under the Uniform Commercial Code at § 9–204(5). The after-acquired property clause is recognized in the Uniform Commercial Code at § 9–

204(3). Section 1–201(44) (b) provides that an antecedent debt is sufficient consideration for the execution and giving of the security interest. See Chaffee v. Atlas Lumber Co., 43 Neb. 224, 61 N.W. 637 (1895); State Bank of Lushton v. O. S. Kelley Co., 49 Neb. 242, 68 N.W. 481 (1896); Longfellow v. Barnard, 58 Neb. 612, 79 N.W. 255 (1899); United States v. First National Bank in Ogallala, Nebraska, Civ. 1718 L (unpublished memorandum, U.S.D.C.Neb.1972).

■ The description of personal property is sufficient, even if it is not specific, if it reasonably identifies what is described. Section 9–110 Uniform Commercial Code. The plaintiff had a security interest in all livestock owned by Pirnie. Under § 9–204(1) a security interest in goods attaches when there is an agreement that it attach, when value is given, and when the debtor has the right to the collateral. The plaintiff's security interest therefore attached to all the livestock owned by Pirnie, either when the loan was made or when Pirnie was entitled to possession of the livestock, whichever was later.

At the time of closing arguments defendants' counsel advanced the defense of waiver. It was asserted that the government waived the protection afforded by § 9–306(3) (a) by failing to meet the notice requirements contained in § 9–502(1). Counsel admitted that in the absence of a finding of waiver the financing statement of the parties would operate to entitle the government to the proceeds received from the January 5, 1968, sale.

■■ However, the threshold question is not whether these statutory provisions are to be read *pari materia,* but is whether § 9–502(1) is applicable to the facts of this case. After a careful reading of § 9–502(1) and the comment to that section, the court is persuaded that the legislative intent was to restrict the section's application to those cases in which the security consists of intangibles, such as accounts or chattel paper. By contrast, in this case the subject of the security interest in the possession of the Ainsworth Livestock Market was not an intangible but cattle that had been delivered for sale and, therefore, § 9–502(1) with its concomitant notice provision does not prohibit the government's reliance on § 9–306(3) (a).

■ A second argument advanced on the waiver defense is that the county supervisor, as a representative of the government, waived the protection of § 9–306(3) (a) during the course of a telephone conversation with the defendant Gifford Pirnie before the sale. The court rejects this argument for two reasons: (1) As already found by the court, the county supervisor's consent to the January 5 sale was qualified by the request that the check representing the proceeds be drafted to the Farmers Home Administration and to Gifford Pirnie as joint payees. The county supervisor's conversation is insufficient as a matter of law to support a conclusion of waiver. (2) Assuming, arguendo, that the conversation in early January were found to be an express waiver by the county supervisor to the government's right under the security agreement and the Uniform Commercial Code, that waiver would not vitiate the government's contractual and statutory rights. 7 C.F.R. § 1800 et seq.

*The June 20 sale.*

The sale at the Valentine Livestock Auction Company on June 20, 1968, was a foreclosure sale of property in which the plaintiff claimed and had a security interest. The property sold was obtained by the United States from the Hamit Ranch in Cherry County, Nebraska, which previously had been ranched by Pirnie but from which he had been dispossessed. All the cattle sold at this sale were branded with the Pirnie brand. The horses and machinery correspond to descriptions on the plaintiff's security instruments in which the defendant Pirnie stated that "Debtor is the absolute and exclusive owner of the above described collateral . . ." The preponderance of the evidence is that all

property sold at that sale belonged to the defendants Gifford A. Pirnie and Lillie Pirnie.

The security agreements granted to the plaintiff a security interest in "All livestock, fish, supplies and other farm products, including those in inventory, now owned or hereafter acquired by Debtor, together with all increases, replacements, substitutions, and additions thereto . . ." and "All farm and other equipment now owned or hereafter acquired by Debtor together with all replacements, substitutions, additions, and accessions thereto . . ."

█ This description was sufficiently broad and sufficiently descriptive to give the plaintiff a security interest in the property sold.

The sale was conducted at a recognized public auction in the area where possession was obtained and where a year-round market existed for the property sold. The sale was advertised as a foreclosure sale on the property of Gifford A. Pirnie by the Farmers Home Administration. It is to be expected that at such a sale the price obtained may not be as high as the price would be if a farmer were selling his own property. However, Nebraska courts have long recognized that in reviewing the price obtained at a sale of secured goods, the trier of fact should consider the circumstances under which they were sold, including the fact that they were forced on the market, whether there was a demand for them at that time, and other factors which exist in a foreclosure sale. Raymond v. Miller (1892), 34 Neb. 576, 52 N.W. 573. Section 9–507(2) of the Uniform Commercial Code states that the fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not in itself sufficient to establish that the sale was not made in a commercially feasible manner.

Generally the law frowns upon the secured party's retaining possession of security for an extended period of time.

As an indication of this, § 9–505(1) of the Uniform Commercial Code requires that goods under certain conditions must be sold within 90 days. A requirement of 7 C.F.R. 1871.31 is that the county supervisor sell repossessed property within 60 days of repossession. The courts have long held that the secured party keeping mortgaged property for an extended length of time would be liable to the mortgagor for damages. Murray v. Loushman (1896), 47 Neb. 256, 66 N.W. 413. Furthermore, the expenses of holding the property for an extended period of time easily could outweigh any increased value the property might obtain.

█ The defendants in their counterclaim urge that this sale was not conducted in accordance with certain Nebraska statutes. The evidence shows that these statutes were complied with by the plaintiff with the exception of § 69–112, Nebraska R.R.S.1943, which requires 20 days' notice prior to the date of sale. The statutes cited in the counterclaim, §§ 69–113 and 69–115, were repealed by Chapter 416, § 1, of the laws of 1967. The 77th Session of the Legislature of the State of Nebraska in which the laws of 1967 were passed convened on Tuesday, January 3, 1967, and adjourned on Saturday, July 22, 1967 (Title Page, Laws of Nebraska, 1967). The Constitution of the State of Nebraska, Article III, Section 27, states that no act shall take effect until three calendar months after the adjournment of the session in which it was passed. An act in Nebraska takes effect three calendar months after adjournment of the Legislature. Summerville v. North Platte Valley Weather Control District, 170 Neb. 46, 101 N.W.2d 748 (1960). Thus, §§ 69–112 through 69–115 were repealed as of October 23, 1967. The only statute governing the foreclosure sale was that appearing in the Uniform Commercial Code, which requires only that a sale must be held in a commercially acceptable manner. I have no doubt that the sale was held in a commercially acceptable manner.

On June 3, 1968, a judgment was entered in the County Court of Cherry County, Nebraska, as a result of which the sheriff was ordered to remove the Pirnies' personal property from the Hamit[s'] land. The United States, having a security interest in this property, in order to protect its investment and with the approval of the sheriff, took possession of Pirnies' property on Hamit[s'] land and delivered it to the Valentine Livestock Auction Company prior to June 20, 1968. The property removed was of large enough volume that its absence would be immediately noted by anyone searching for it on Hamit[s'] land. Removal of the property from the ranch began shortly before the middle of June, 1968, and continued up until the time of the sale. The plaintiff caused notice of the sale to be published in the *Valentine Newspaper* in the issue dated June 13, 1968, and a copy of that notice was mailed to the defendants on June 14, 1968. The defendants refused to accept the notice on June 15 and on June 21, 1968.

Section 9–504(3) of the Uniform Commercial Code provides, "Reasonable notification of the time and place of any public sale . . . shall be sent by the secured party to the debtor." Under the circumstances of this case I conclude that the notice sent by the United States to the Pirnies was reasonable.

It was not necessary for the plaintiff to make demand upon the defendants prior to the plaintiff's taking possession of or selling the property involved in either the sale of January 5 or of June 20. The security agreements provided that the debtor "waives all notices" and provides that the "Secured Party at its option, may . . . (b) enter upon the premises and take possession of, repair, improve, use and operate the collateral . . . for the purpose of protecting or preserving the collateral or this lien, or preparing or processing collateral for sale." Upon default the plaintiff had the right to take possession of the collateral in accordance with § 9–

503 of the Uniform Commercial Code.

Although no demand was necessary, demand was made a substantial period of time before even the first sale. No commencement of a judicial action prior to the taking of possession of the security was required. Section 9–503 of the Uniform Commercial Code states:

"Unless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by action."

In this case there was no breach of the peace in the taking of any of the secured property. See In re Yale Express System, Inc., 370 F.2d 433 (C.A. 2nd Cir. 1966), and In re United Thrift Stores, Inc., 242 F.Supp. 714 (U.S.D.C. N.J.1965), affirmed 362 F.2d 11.

I conclude that the sales of January 5 and June 20, 1968, were conducted in accordance with law and that a fair market price was received on each occasion for the items sold. The property sold at each sale was subject to the security interest of the United States and the proceeds of those sales belong to the United States.

The counterclaim cannot be sustained, because there has been no evidence of any improper act on the part of the United States or of any damage resulting to the defendants from any such act.

There is due the plaintiff from the defendants, Gifford A. Pirnie and Lillie Pirnie, the amount of $31,830.38 in principal and $6,940.73 in interest to the date of this judgment. The amounts paid into the registry of the court should be paid to the plaintiff and the defendants Pirnie are liable for the deficiency.

The United States has requested that this court find that the United States has a security interest in property which was not sold at either of the sales and has suggested that the court

direct the United States Marshal to seize whatever property is subject to the government's security interest and sell it. No authority for the court's taking that course has been offered and I have found none. The evidence in this case is insufficient to establish the existence or whereabouts of any such property. The normal processes for execution of a judgment are available to the United States.