296 So.2d 32 (1974)
INTERNATIONAL HARVESTER CREDIT CORPORATION and Florida Truck and Tractor Company, Petitioners,
v.
AMERICAN NATIONAL BANK OF JACKSONVILLE, a National Banking Corporation, Respondent.
No. 43222.
Supreme Court of Florida.
February 13, 1974.
Rehearing Denied May 22, 1974.
*33 W. Sperry Lee, Ulmer, Murchison, Ashby & Ball, and Chester Bedell, Bedell, Bedell, Dittmar, Smith & Zehmer, Jacksonville, for petitioners.
Richard C. Stoddard, Bryant, Dickens, Rumph, Franson & Miller, Jacksonville, for respondent.
Edward I. Cutler, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, and Otterbourg, Steindler, Houston & Rosen, New York City, for Chemical Bank, amicus curiae.
DEKLE, Justice.
This certiorari review is based upon two questions certified to us by the First District Court of Appeal as being ones of great public interest.[1] The stipulated facts are succinctly set forth in the District opinion at 269 So.2d 726 (1972).
The questions certified involve the Uniform Commercial Code, as adopted in Florida, and are as follows:
1. Under Florida Statute 679.302(1)(c), must a seller of farm equipment file a financing statement to perfect his security interest in farm equipment sold under one contract when the purchase price of each item is less than $2,500.00, but the total amount of the contract for all items exceeds $2,500.00?
2. Under Florida Statute 679.312(4) and (5), does a party with a security interest in after acquired property take priority over a party with a purchase money security interest which was not perfected within ten days after the debtor took possession of the collateral?
The district court answered both questions in the affirmative. We reverse and answer the first question in the negative and agree with the dissent of Rawls, Acting C.J., in modifying the district court's affirmative answer to the second question.

FIRST QUESTION
The first question deals only with farm equipment as one of the statutory exceptions to the otherwise required filing of a "financing statement" to perfect the seller's security interest. This exception is with respect to farm equipment which has "a purchase price not in excess of $2,500." The question is whether several separate farm items, each costing less than $2,500, but when totaled under one contract exceed $2,500, still fall within the exception. We think that they do and that no filing is required.
The statute, § 679.302(1)(c), speaks of "a purchase price" of the item. This statutory reference controls and not the lumping together of several purchase prices in a single contract. Such view is confirmed by the next clause in the statute which states: "but filing is required for a fixture under § 679.313." The syntax is consistently in the singular. It is the purchase price of each item (each purchase) which controls, rather than the total "contract price" as used in the district opinion. There was a valid reason for the statute to set a ceiling on substantial items of equipment; apparently the Legislature fixed upon $2,500 as being a reasonable one. This purpose would be defeated by simply allowing the lumping together of various smaller items to arrive at such a minimum amount. It seems illogical that the exception in this statute was intended to cover a purchase contract on various miscellaneous farm items, each under $2,500 but totaling $2,500 in the aggregate, which could include harrows, rakes, discs, attachments and even shovels and hoes. The exception was plainly intended to cover farm items *34 substantial enough to cost $2,500. The conclusion of the district court to the contrary perhaps emanated from the point of view taken in its opinion, namely, that of the seller in its dealings with its purchaser, as to whether he chooses to list the $2,500 items on separate contracts or to lump all items together in order to assure a continuing lien upon all equipment until the full debt is paid. This is immaterial to the relationship between an earlier creditor claiming a priority and a subsequent seller. The statute deals simply with $2,500 major items without regard to the manner of securing the purchase price between the immediate seller of the farm equipment and the purchaser, so that this is not controlling.[2]

SECOND QUESTION
Concerning the second question regarding "after acquired property" as to security priorities, we are in agreement with the district's majority position in recognizing the earlier creditor's priority of security in after-acquired property (unless the required financing statement has been timely filed on such subsequent purchase). Fla. Stat. § 679.312(4), F.S.A. However, we differ with the district majority and agree with Acting Chief Justice Rawls that this priority security protection to the earlier creditor must be limited to the debtor's equity in the after-acquired property. This position is consistent with contractual constitutional requirements and equitable principles. The new seller's contract rights with his purchaser and any ownership retained in the property sold must be respected; moreover, it would be an invidious preference to the earlier creditor-bank without so much as a showing that there was a compelling public interest or purpose served by such arbitrary requirement of outright priority to the earlier creditor in the total after-acquired property.
The contention is made that to restrict the prior creditor's priority in the after-acquired property to the debtor's equity therein renders meaningless the requirement for filing a financing statement. We do not think so. There really are no conflicting security interests in this situation. That security interest retained by the subsequent seller in the after-acquired property never passes to the buyer-debtor and thus never becomes subject to the earlier creditor's claim of security interest in such after-acquired property. On the other hand, the earlier (perfected) creditor does have his security in that interest which is after-acquired by his debtor.
In this respect we note that the statute grants the priority in the debtor's after-acquired property; it refers to the respective security "interest" as being thereby affected.[3] The debtor, while acquiring the physical property, only acquires an interest therein under a credit sales contract; it is this interest only then which is "after acquired" and thereby subject to the earlier security right. The remainder is upon credit from the new creditor who often also retains title thereto. It would be abhorrent to equity and justice that the earlier creditor should acquire the subsequent creditor's property or "interest" in this manner. Upon principles of equity and in the avoidance of unjust enrichment, the limitation to the debtor's equity in after-acquired property appears to be the better and more logical rule. We would accordingly agree with Acting Chief Judge Rawls in this respect.
The "new value" section of the code, § 679.108, urged by petitioners, is not invoked in the circumstances sub judice. The earlier secured creditor, respondent, stands upon its original contract and not upon "new value."
Logical and traditional equitable reasons preclude a result which would allow the bank as mortgagee to subject the after-acquired *35 farm equipment as its collateral, while not changing its position and giving no "new value" because of the later sale of equipment; consequently, the bank was not misled by the failure of the seller of the equipment to record his purchase money security.
To give the prior creditor the seller's retained interest in such property simply because of such seller's failure to record and to permit the original creditor to replevin the sold equipment would be to give to such earlier creditor a windfall not favored by the code (see § 679.108 and U.C.C. Comment 19C F.S.A. 198) contrary to established principles. Compare County of Pinellas v. Clearwater Federal Savings & Loan Ass'n, 214 So.2d 525 (Fla.App.2d 1968).
Our viewpoint regarding a limitation (to the buyer's equity) of the security of the earlier creditor, allows a just result to such creditor and yet is consistent with constitutional requirements as to the subsequent seller. Our position acknowledges, yet modifies, the view expressed by Judge Wigginton and that of the other jurisdictions cited in his opinion.
We accordingly modify the district court holding as to question 2 to the extent of limiting the priority allowed by the commercial code to the first (perfected) creditor (absent timely filing) to the extent of that creditor's debtor's equity in the after-acquired property under whatever contract it was purchased, preserving to the new seller his retained interest in such after-acquired property.
It is so ordered.
ROBERTS, ERVIN and ADKINS, JJ., concur.
McCAIN, J., concurs in part and dissents in part with opinion.
CARLTON, C.J., dissents with opinion, in which BOYD, J., concurs.
McCAIN, Justice (concurring in part and dissenting in part):
I concur in the majority's negative answer to the first certified question that when each item is less than $2,500.00, no financing statement need be filed, although the total is in excess of $2,500.00.
I dissent to the answer upon the second question as to priority interests.
CARLTON, Chief Justice (dissenting):
Before making any attempt to answer the questions certified to us, before even looking at the sections of the Uniform Commercial Code involved, we should first set out the proper guidelines for judicial interpretation of Legislative Acts, in general, and the Code, in particular.
Most importantly, we are bound to give effect to the Legislative intent when that intent can be determined. Where the language of a statute is clear and specific, the intent of the Legislature is obvious  to enact and give effect to that exact language in that exact form. Of course, statutory language is not always so clear and specific; it is often open to different interpretations when applied to particular factual situations. In such cases, there is often a general intent or purpose expressed in the statutes, and any judicial interpretation should be consistent with this purpose or intent. With respect to the Uniform Commercial Code, there are also two other important aids to interpretation  those specified in the Code and the Official Comments to the Code. As stated by one commentator on the Code:
"... An enacting legislature clearly intended to pass the Code in the form in which it was enacted and, except where local variations were made, it meant for an act sponsored by the National Conference of Commissioners on Uniform State Laws and the American Law Institute to be interpreted as the act itself specified, with the aid of the Official Comments. [Footnote omitted.] *36 Enactment was an act of faith: faith in the Code's sponsors and what they were trying to do."
Henson, Secured Transactions Under the Uniform Commercial Code, Sec. 2-1, pp. 7-8 (1973).
The same commentator points out that:
"The Code contains express provisions on its own interpretation. Section 1-102 [Fla. Stat. § 671.102, F.S.A.] provides:
(1) This Act shall be liberally construed and applied to promote its underlying purposes and policies.
(2) Underlying purposes and policies of this Act are
(a) to simplify, clarify and modernize the law governing commercial transactions;
(b) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties;
(c) to make uniform the law among the various jurisdictions.
This command from the enacting legislature is entitled to complete acceptance, recognition and enforcement by every court. [Footnote omitted.] The personal predilections of a particular judge are not properly part of the interpretative process.
It is the legislature's function to reflect the will of the people through enactments, and it is the court's function to properly interpret and enforce what the legislature has enacted except where constitutional inhibitions prohibit such action."
Id. at Sec. 2-2, pp. 10-11.
The Official Comments to the Code should be given great weight in interpreting its various provisions. The Comments often explain each provision's function in terms of the underlying purposes of the Code and the intricate and rational relationship with many other provisions. The late Professor Karl N. Llewellyn, one of the primary drafters and promoters of the Code, explained the purpose of the Comments in these terms:
"Every provision should show its reason on its face. Every body of provisions should display on their face their organizing principle. The rationale of this is that construction and application are intellectually impossible except with reference to some reason and theory of purpose and organization. Borderline, doubtful, or uncontemplated cases are inevitable. Reasonably uniform interpretation by judges of different schooling, learning and skill is tremendously furthered if the reason which guides application of the same language is the same reason in all cases. A patent reason, moreover, tremendously decreases the leeway open to the skilful advocate for persuasive distortion or misapplication of the language; it requires that any contention, to be successfully persuasive, must make some kind of sense in terms of the reason; it provides a real stimulus toward, though not an assurance of, corrective growth rather than straitjacketing of the Code by way of case-law. [Footnote omitted.]"
White & Summers, Uniform Commercial Code, Sec. 4, pp. 11-12 (1972).
Another guideline for interpretation of the Code should be decisions of other jurisdictions on the same questions; and these should be more persuasive than would be the case for questions not involving the Code. After all, one of the primary purposes of the Code is to make commercial law uniform among the States. Decisions from other jurisdictions should, of course, not be followed if they are clearly erroneous, simply for the sake of uniformity; but, when they are well-reasoned and consistent with the purposes of the Code, there ought to be some compelling reason to justify a contrary conclusion.
*37 Finally, in interpreting the Uniform Commercial Code, we must be mindful of the fact that it is the function of the Legislature  and not of this Court  to legislate, to determine what the commercial law of this State shall be. We cannot override this Legislative function by interpreting statutes contrary to the expressed intent of the Legislature, inconsistent with the specific language of the statutes, and inconsistent with common sense.

QUESTION I
The first question certified to us is:
"Under Florida Statute 679.302(1)(c), must a seller of farm equipment file a financing statement to perfect his security interest in farm equipment sold under one contract when the purchase price of each item is less than $2,500.00, but the total amount of the contract for all items exceeds $2,500.00?"
The types of security interests involved in this case are perfected by filing. One exception to the filing requirement is provided by Fla. Stat. § 679.302(1)(c), F.S.A., which excludes:
"(c) A purchase money security interest in farm equipment having a purchase price not in excess of $2500... ."
The purpose of a filing system is obvious  to give notice, as far as is practicable, to possible creditors of the existence of other creditors and their security interests in a debtor's property, thus making credit less of a risk, less expensive, and more easily available. To this end, the exceptions to the filing requirement are few, and the purpose of the exceptions is explained in the Official Comments.
The above-quoted exception was intended to relieve a seller of the burden of filing every time a farmer makes a small purchase on credit. The exception is similar to the one which relieves sellers of consumer goods from filing every time. Fla. Stat. § 679.302(1)(d), F.S.A. It is interesting to note, however, that the exception we are here concerned with has recently been deleted by the framers of the Code, although the Florida Legislature has not yet followed suit, because the effect of excepting the filing of encumbrances on much of a farmer's equipment was to make most of his equipment  whether actually encumbered or not  unavailable to him as collateral for loans from wary lenders. Uniform Commercial Code, 1972 Official Text, appendix, Comments to § 9-302.
The effect of broadening the exception will be to make lenders even more wary of accepting smaller farm equipment as collateral. Another effect will be to more often falsely induce prior creditors secured by after-acquired property to make future advances based on the erroneous assumption that their collateral has been increased.
Our majority opinion correctly applies the English syntax to one term used in the statute  "purchase price"  and deduces that the number of the noun is singular. I agree that the statute speaks of one price, one purchase, and one security interest. One security interest, however, may be obtained in several items of collateral. A debtor may, for example, borrow $10,000 using five automobiles to secure the loan. It is elementary commercial law that each of the five automobiles is subject to the security interest created until the entire loan is satisfied, unless the agreement provides otherwise.
Similarly, one purchase  and one "purchase price"  may cover several items of equipment. ("Equipment" is used in the Code as a plural or collective noun. Fla. Stat. § 679.109(2), F.S.A.) When any creditor  whether or not it is the seller (Fla. Stat. § 679.107, F.S.A.)  obtains a purchase money security interest through one sale of farm equipment, there is only one security interest created. If the buyer defaults on the purchase money loan, all of the equipment forming the collateral may be used to satisfy the security interest.
The majority opinion states that, "There was a valid reason for the statute to set a *38 ceiling on substantial items of equipment... . This purpose would be defeated by simply allowing the lumping together of various smaller items to arrive at such a minimum [sic] amount." The purpose for setting a ceiling on the exception to filing is not stated, but it is obviously the same purpose for which filing is generally required  to make other creditors aware that property in a debtor's possession is encumbered by a security interest. The purpose of the exception is equally obvious  to relieve creditors, particularly sellers, of the burden of filing security agreements when smaller purchases are financed. These are, however, inconsistent purposes, so the ceiling on the filing exception provides a balance betweeen the two.
The question before us is whether the ceiling set by the statute refers to the total purchase price of several items purchased at one time and used as collateral for a purchase money security interest or to the individual cost of each item included in the purchase. The question must be answered in light of both the purpose of the general filing requirement and the purpose of the exception.
The answer arrived at in our majority opinion certainly satisfies the purpose behind the exception, since it relieves creditors of the filing requirement with respect to every item of collateral costing less than $2500, even when that collateral is part of the security for a much larger loan. This answer, however, ignores the basic purpose for the filing requirement in general. It provides for a filing exception even when property of unlimited value  collectively  is encumbered under security interests of unlimited amounts. Other creditors will have no notice of prior perfected security interests in any piece of farm equipment worth less than $2500 and they will be reluctant to accept such equipment as collateral. Since a great deal of farm equipment  often used collectively as collateral for large loans  may be worth less than this amount, the availability of credit to farmers will be seriously affected.
On the other hand, interpreting the ceiling on the filing exception to mean the total price of the purchase which gives rise to the purchase money security interest gives other creditors much more notice of outstanding security interests in a farmer's equipment. Such an interpretation would still, however, relieve sellers of farm equipment from having to file security interests for many small, day-to-day purchases of farm equipment which are paid for on an installment basis.
The answer of our majority opinion to the first question certified is not only inconsistent with the purpose underlying the whole filing system; it is also contrary, in its practical effects, to generally accepted principles of the law of secured transactions. As noted above, several items of collateral are often used as security for one loan. To secure the loan, one security interest is given  collectively  in the total amount of collateral. Only one security agreement is necessary, and only one must be filed. Such a security interest is not divisible; each item of collateral does not secure only a proportional part of the loan; the entire collateral secures the entire loan until it is paid. Likewise, when a single purchase of several items of equipment is either partly or entirely financed, and a security interest in the equipment is given to secure the loan, each item of equipment does not secure only its own purchase price  each and every item secures the entire loan.
One practical effect of interpreting "purchase price" to mean the price of each individual piece of equipment will be to confuse sellers as to just what their secured rights are. According to the majority view, if a seller  in one contract  sells several items of equipment to a farmer on credit but doesn't file his security agreement or financing statement, he will have a perfected security interest in the equipment individually worth less than $2500, but an unperfected interest in the items worth more than that. Do the smaller pieces secure the entire amount financed or *39 do they now only secure a part of the debt, in proportion to the total value of equipment purchased?
A practical example may help to point out the problems created. Assume a farmer buys $20,000 worth of equipment in one purchase, paying $10,000 in cash, borrowing the remaining $10,000 from a bank, and giving the bank a security interest in the equipment to secure the loan. (The bank has a purchase money security interest under the Code.) One item of the equipment costs $10,000; the remaining items each cost less than $2500. The bank never files a financing statement or security agreement; therefore, under our majority view, it has a perfected security interest in the smaller items but an unperfected security interest in the $10,000 item.
Suppose that the farmer then uses this equipment as collateral for another loan; that the second creditor perfects his security interest; and that the farmer defaults on both loans without making any payments. Under our majority view, the second creditor will have priority as to the $10,000 piece of equipment, but, of course, if the amount realized on this collateral is less than the outstanding debt, a part of the debt will still be unsatisfied.
The bank/first creditor, under our majority view, has priority as to the remainder of the equipment. If this equipment is sold at auction and brings, say, $9,000, how much of this is the bank entitled to? Its outstanding debt is $10,000, so under general principles it would be entitled to the entire amount. However, if we are now to treat security interests as divisible, as per our majority view, this half of the collateral only secured half of the debt. Therefore, when the $9,000 realized is applied to the $5,000 debt it secured, there is a remainder of $4,000 which should go to the second creditor (with second priority) to satisfy his debt.
Many other problems  involving setoffs, allocation of payments, etc.  are also created by considering one "purchase" and one loan and one financing agreement for the aggregate price of the equipment purchased as being composed of smaller ones based on the price of each piece of equipment.
No reason is given by our majority for reaching the interpretation it does  except that the term "purchase price" is singular in the statute. In my view, this does not justify answering the question certified to us in a manner which simply makes no sense when measured against the purposes of the Code and this particular section of it and against the common understanding of the nature of security interests and the law of secured transactions in general. One loan which finances one purchase simply creates one security interest, no matter how many items form the collateral.
The District Court below, in a scholarly opinion by Judge Wigginton, unanimously agreed upon an affirmative answer to Question I, and I would adopt his opinion on this question in its entirety.

QUESTION II
I must also dissent as to the majority answer given to Question II. I would also adopt Judge Wigginton's opinion, and Judge Johnson's special concurrence, as to this question, and answer it unqualifiedly in the affirmative. Our majority opinion pays "lip service" to the Code but "legislates" an exception to the clear and specific provisions of the Code so as to make those provisions meaningless as applied to the situation before us.
The priorities to be given to competing security interests in the same property is properly a legislative determination. Our Legislature, by adopting the Uniform Commercial Code, has enacted a complete, concise, and logical system of priorities, and we cannot change it even though we vaguely feel that a different system would be more equitable.
Two reasons are given by the majority for the conclusion reached  unspecified *40 "contractual constitutional requirements" and "equitable principles". As to the constitutional requirements, I am aware of no constitutional provision which prohibits the Legislature from giving priority to one valid security interest which is perfected according to statute over another valid security interest, whether the priority interest is the one first created or the second. If there are such constitutional provisons, they must certainly call for the invalidation of our recording statutes concerning interests in real property. Under these statutes, a conveyance of real property which is first recorded takes precedence over a prior conveyance which is recorded second.
As to "equitable principles", when there are competing security interests in the same property and the property is insufficient to satisfy both debts, any priority to either creditor is, in a sense, inequitable. The filing system for security interests which is established by the Code, however, generally lessens any inequitable results by providing that one who contracts for a security interest in property with notice of a prior perfected security interest in the same property takes second priority. That is exactly the situation we are presented with here, and I see nothing inequitable in granting the prior creditor the preference clearly provided in the Code. In fact, the second creditor in this instance could have gained for his security interest a priority over an earlier security interest of which he had notice. All the second creditor had to do, under a special exception in the Code, was file his security agreement within ten days. He didn't do this, so I see nothing inequitable in the Code provisions giving priority to the first creditor  who did all that was required by the Code to protect his interest.
I surmise that the real reason underlying the answer given by the majority to Question II is a general aversion to security interests in after-acquired property. Such security interests are, however, a common and often necessary tool of modern financing. Note that the Legislature intended the Code to be interpreted so as "to permit the continued expansion of commercial practices through custom, usage and agreement of the parties."
The Uniform Commercial Code specifically recognizes the validity of security interests in after-acquired property, with some restrictions on their use. See Fla. Stat. §§ 679.108 and 679.204, F.S.A. The Code does not limit security interests in after-acquired property to an interest in only the debtor's "equity". In fact, one of the primary innovations of Article 9 of the Code was the elimination of all the distinctions between various kinds of security devices and the creation of a single type of contractual lien called a "security interest"  with no distinction based upon the method by which the lien is created. Fla. Stat. § 679.102(2), F.S.A.; 19C F.S.A., Comment 1 to § 679.102, p. 155; see White & Summers, supra, Sec. 22-1, pp. 754-757.
Pre-Code Florida law also recognized the validity of security interests in after-acquired property, with no such restriction limiting them to a debtor's "equity" in his property. See, e.g., Rose v. Lurton Co., 111 Fla. 424, 149 So. 557 (1933), cited in the District Court opinion of Judge Wigginton. The restriction on such security interests is a new concept  not only inconsistent with Article 9 of the Code, but inconsistent with pre-Code law as well.
As to Article 9 of the Code, there are certain important general concepts  some of which are sweeping changes from pre-Code law  which underlie the entire theory of the Article. Our majority opinion totally rejects or ignores these concepts, witness the following passage:
"... The debtor, while acquiring the physical property, only acquires an interest therein under a credit sales contract; it is this interest only then which is `after acquired' and thereby subject to the earlier security right. The remainder *41 is upon credit from the new creditor who often also retains title thereto... ."
First, under the Code, a buyer of property under a credit sales contract does not acquire an "interest" in the property; he acquires the property. (Otherwise, how could even a subsequent creditor ever obtain a security interest in anything but the debtor's "equity"?) It is the seller of the property that retains only a security interest. See Fla. Stat. § 672.401(1), F.S.A. There are certain provisions in the Code which allow a buyer and seller to specify how and when title passes  for particular purposes wherein the question of title is relevant; but the concept of title is totally irrelevant under Article 9 of the Code dealing with secured transactions. Fla. Stat. § 679.202, F.S.A. specifically provides:
"Each provision of this chapter with regard to rights, obligations and remedies applies whether title to collateral is in the secured party or in the debtor." (Emphasis supplied.)
Also, Fla. Stat. § 671.201(37), F.S.A. defines "security interest" as follows:
"`Security interest' means an interest in personal property or fixtures which secures payment or performance of an obligation. The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (§ 672.401 is limited in effect to a reservation of a "security interest'... . ." (Emphasis supplied.)
Second, there is no difference between the relationship of a buyer and seller under a sales contract giving rise to a security interest and the relationship of any other debtor and creditor under any type of security agreement. As evidenced by Fla. Stat. §§ 671.201(37) and 679.102(2), F.S.A., the Code recognizes only a single form of contractual lien on personal property  a "security interest."
Third, the majority opinion fails to recognize the fact that the owner of a purchase money security interest may be someone other than the seller. Fla. Stat. § 679.107, F.S.A. A third party who advances money used to purchase personal property and who takes a security interest in that property has a purchase money security interest; but it is still only a "security interest", the same as the seller would have  it is not "title". A purchase money security interest may also be assigned to a third or fourth party, without losing its character as such. (This is the situation before us.) Only a "security interest" is assigned, however  not "title".
There is only one relevant distinction between the security interest a creditor obtains in equipment he sells and any other security interest he obtains in any other collateral for any other loan. The sole distinction is that the Code gives a special preference to purchase money security interests through an exception to the general rules establishing the priorities between conflicting security interests.
The clear and specific language of the Code provisions outlining these priorities leads me to conclude that the only logical answer to the second question certified is an unqualified, unconditional "yes".
The precise question certified is:
"Under Florida Statute 679.312(4) and (5) [F.S.A.], does a party with a security interest in after acquired property take priority over a party with a purchase money security interest which was not perfected within ten days after the debtor took possession of the collateral?"
Florida Statute § 679.312(5)(a), F.S.A. states the general rule regarding priority of security interests which are perfected by filing (as both of these are). That subsection provides that, unless there is some special priority rule set forth in subsection (3) or (4), these security interests take precedence, "In the order of filing ... *42 regardless of which security interest attached first ... and whether it attached before or after filing."
In this case, if the general rule were applicable, the security interest in after-acquired property would take priority over the purchase money security interest, because it was filed first. There is, however, an exception to the general rule, provided by § 679.312(4), which is applicable to this situation. The exception is that, "A purchase money security interest ... has priority over a conflicting security interest in the same collateral... ."
If this exception is effective, a purchase money security interest has priority over a prior security interest in the debtor's after-acquired property, and the order of filing is irrelevant.
Subsection (4), however, goes on to provide that the exception is only effective, "... if the purchase money security interest is perfected [in this case, filed] at the time the debtor receives possession of the collateral or within ten days thereafter."
In the case sub judice, the purchase money security interest was not filed within ten days. The exception of subsection (4), therefore, did not take effect. No other exception is applicable, so the general rule of subsection (5)(a) applies. Since the general rule applies, the security interest first-filed  the interest in the debtor's after-acquired property  has priority. To demonstrate how obvious the Code is that the general rule be applied here, it is only necessary to quote the rule and its introductory remarks:
"(5) In all cases not governed by other rules stated in this section (including cases of purchase money security interests which do not qualify for the special priorities set forth in subsections (3) and (4) of this section), priority between conflicting security interests in the same collateral shall be determined as follows:
(a) In the order of filing if both are perfected by filing, regardless of which security interest attached first ... and whether it attached before or after filing;" (Emphasis supplied.) Fla. Stat. § 679.312, F.S.A.
The statutes could hardly be clearer or more explicit. The rules apply to "conflicting security interests in the same collateral." There is no exception anywhere in the Code that makes the rules inapplicable when one of the conflicting interests is a purchase money interest and the other is a prior interest in after-acquired property.
The majority opinion, however, creates such an exception, apparently because the proper application of the rules in this case would be "abhorrent to equity and justice." I do not understand, though, why it is abhorrent to give priority to one creditor, who files his security interest in after-acquired property, over a subsequent creditor who has notice of the prior interest (which had to be filed in the debtor's county of residence) and fails to do one simple act which would place him in a priority position (a similar filing within ten days). Also, I think that if a clear and specific statute enacted by our Legislature does reach a result which this Court considers inequitable, we do not have the authority to rewrite the statute or create exceptions contrary to its plain language.
Aside from the preference he could easily have obtained by following the simple procedure of the statute, the purchase money creditor also had other options which he could easily have followed in this case to insure a priority position. For example, since he had notice of the first filing by the prior creditor, he could have required his buyer to obtain a termination statement or a release of collateral or a subordination agreement. See Smith, Article Nine: Secured Transactions  Perfection and Priorities, 44 N.C.L.Rev. 753, 796 (1966); Uniform Commercial Code  Priorities, 19 S.C.L.Rev. 724, 731 (1967).
*43 Also bearing on the equitable considerations of this case is the fact that the petitioner who owns the purchase money security interest is not even the original seller. As previously noted, the installment contract and security agreement were commercially assigned to this creditor long after the ten day grace period for filing had passed. This creditor had constructive knowledge, from the public records of the debtor's county of residence, that there was a security interest which had priority to the one it was buying.
Finally, the majority opinion seems to be looking at this situation as if the only party involved who has any need for notice of the other creditor's interest is the holder of the purchase money security interest. Completely ignored is the fact that the agreement creating a security interest in after-acquired property might also have contained a provision for future advances to be secured by the same collateral (a common practice of modern financing). If a seller is allowed to place in the hands of a debtor valuable property which is encumbered, and is not required to file the encumbrance, a prior creditor may advance further sums on the mistaken belief that his security is increased considerably by after-acquired property. The strict notice (filing) requirements of the Code operate to equitably protect both parties. What could be more equitable than a system which gives priority to any party only if he gives proper notice to other parties so that they are not injured?
The majority opinion also falsely assumes that a creditor who has a security interest in after-acquired property has no need for such protection and that anything he receives thereunder is a total "windfall". (Fla. Stat. § 679.108, F.S.A. and the Comments thereto relating to "windfall" are totally irrelevant. They deal with security interests created after the debt secured and they characterize such interests as "windfall" preferences under the federal Bankruptcy Act.) As already mentioned, such interests are often coupled with provisions for future advances. Many farmers need these open-end financing arrangements, but if we are going to make the future advances unprotected they will also become unavailable. Then, too, there is the creditor who advances more money than the farmer can adequately secure. A security interest in after-acquired property in that case is the only way the creditor can fully secure the loan, and the interest in after-acquired property is hardly a "windfall". Also, regardless of whether an interest in after-acquired property is necessary to fully protect a creditor, if he bargains for such an interest and receives it as part of his security, we cannot retroactively declare that this contractual right is now meaningless.
That is exactly what we do when we say that the interest attaches only to a debtor's "equity" in his property. Moreover, such a declaration renders absolutely meaningless the Code provisions establishing priorities between conflicting security interests.
Under the view of the majority, even if a seller under an installment contract did retain title, or if the buyer got title but only really owned an "equity" or "interest" in the property, how could the buyer ever use more than just his "equity" or "interest" to secure another debt? He couldn't. If only what he "owns"  his "equity"  is his property as far as a security interest in after-acquired property is concerned, then his "equity" is also the only property he can use as collateral for a subsequent loan. If this is the case, the only thing the debtor owns  his "equity"  is the value of the property over what he still owes on the purchase price. Under this view, then, there could never be a security interest on the property which would conflict with the purchase money security interest, because the latter only secures what is still owed. Therefore, with respect to purchase money security interests, all the rules of the Code for determining priority of conflicting interests  including those that specifically mention purchase money security interests  are meaningless.
*44 Under the majority's reasoning, to be entirely logical, we must also say that any time a debtor uses as collateral property in which there is already an outstanding security interest he may only give a security interest in his "equity" in the property. It is elementary that the debtor's "equity" in the property would be that amount of its value over and above the amount necessary to satisfy the first secured debt. Therefore, each security interest attaches to separate elements of the property, and they can never conflict. What we have done, in effect, is establish a system of priorities  based upon the order of attachment. The first interest to attach has priority; if there is anything left over, it goes toward satisfaction of the second interest to attach.
Now, that is one equitable way of determining priorities, i.e., by the order in which the security interests attach to the property. Our Legislature, however, has decided that the order of attachment might not always be the most equitable method for determining priorities. By adopting the Uniform Commercial Code, the Legislature has set out three methods  the "first-to-attach", the "first-to-file", and the "first-to-perfect"  which are applicable in different situations. See Uniform Commercial Code  Priorities, 19 S.Car.L.Rev. 724 (1967). As outlined above, the first-to-file rule is clearly applicable in this case, unless the purchase money security interest was filed within ten days.
Our majority opinion concludes that it "acknowledges" that the Code provisions give priority to the security interest in after-acquired property but that such priority is limited to the debtor's "equity" in the property. Restated, the majority holds that the security interest in after-acquired property has priority under the Code  but only to the extent that it has no priority whatsoever! This holding pretends to follow the statutes while rendering them totally meaningless.
To see the non-logic of this position, it is only necessary to apply it to the facts of the case before us. The security interest in after-acquired property was properly filed; the subsequent purchase money security interest was not filed within ten days so as to gain an absolute priority. The security interest in after-acquired property therefore has priority as to the debtor's "equity". When the property is sold to satisfy the debts, the purchase money loan is paid off first; anything left over is the debtor's equity, and this goes to the owner of the security interest in after-acquired property. What would have happened if the owner of the purchase money security interest had filed it within ten days and received an absolute priority? The result would be exactly the same! Therefore, the majority answer to Question II is not, as characterized, a qualified "yes"; it is an absolute "no". This answer is not only directly contrary to the specific provisions of the statutes; it is also contrary to the conclusion reached by every other appellate court and every legal scholar that has considered the same question.
The Uniform Commercial Code has been highly praised for its effectiveness, which is evidenced by the almost total absence of litigation involving the Code before this Court. The reasons for the Code's effectiveness are that it is simple, explicit, clear and complete. Almost every situation is expressly covered by the Code's provisions and, where there are exceptions to the rules the exceptions are clearly spelled out. Concerning Article Nine of the Code, as previously mentioned, it replaced many devices formerly used to encumber personal property (such as chattel mortgages, leases with options to buy, trust receipts, and conditional sales) with a "single lien" called a security interest, and it set out simple and specific rules for determining priorities among conflicting security interests in the same property. See Hawkland, A Bowing Acquaintance With the Uniform Commercial Code, 44 N.C.L.Rev. 525, 537 (1966).
It has been suggested that what little litigation there is under the Code is the result of the unwillingness of lawyers and *45 judges to accept and adhere to such sweeping changes made by the Code to our commercial law. Welsh, Judicial Interpretations of the Filing Requirements Under Article Nine of the Code, 37 Tenn.L.Rev. 273, 333 (1970). Article 9 makes such sweeping changes, particularly in regard to the old "title" and "lien" theories. Another commentator has said that:
"... Those words are familiar and time-worn, with well-accepted meanings and judicial interpretations; some court, in interpreting Article 9, might have reached a result not intended by the draftsmen because of the judge's unconscious inability to escape the strictures of a pre-conceived idea of end results which end results formerly followed under pre-Code law when `title' or `lien' appeared in the context of the particular problem the judge was called upon to solve."
Bunn, Snead, & Speidel, An Introduction to the Uniform Commercial Code, Sec. 4.2, p. 325 (1964).
Since the success of the Code is based on its simplicity and its certainty, courts should make every effort to interpret its provisions simply, literally, and absolutely. By creating judicial exceptions, changing definitions, and interpreting the Code extremely broadly, we will eventually reproduce the morass of confused commercial law the Code was designed to correct. In this particular case, I feel we are going out of our way to do just that, because the Code provisions involved are not in the least ambiguous. In reversing a lower court which had ruled in conformity with our majority opinion on this question, the Supreme Court of Minnesota stated:
"The code very simply and briefly provides for a notice-filing procedure... . The first to file shall prevail. Although there are a few exceptions, they are very clearly and definitely stated. To affirm here would amount to a limitation upon the efficacy of the first-to-file rule, which is basic and essential to the certainty that Art. 9 seeks to achieve."
James Talcott, Inc. v. Franklin National Bank of Minneapolis, 292 Minn. 277, 194 N.W.2d 775 (1972).
The same question has also been decided by appellate courts of other jurisdictions. North Platte State Bank v. Production Credit Ass'n of N. Platte, 189 Neb. 44, 200 N.W.2d 1 (1972); National Cash Register Co. v. Firestone & Co., Inc., 346 Mass. 255, 191 N.E.2d 471 (1963); Sunshine v. Sanray Floor Covering Corp., 64 Misc.2d 780, 315 N.Y.S.2d 937 (Sullivan Co. 1970); National Cash Register Co. v. Mishkin's 125th St., Inc., 65 Misc.2d 386, 317 N.Y.S.2d 436 (New York Co. 1970). All five courts had no difficulty whatsoever in unanimously upholding the exact, literal provisions of the Code  completely contrary to the result reached by our majority. The District Court of Appeal also reached the contrary result. Out of all the judges and justices who have considered this question, our majority opinion is in agreement with only one of them, Chief Judge Rawls of the District Court. The short dissenting opinion by Judge Rawls, however, is completely based on the same mistaken notion that under the provisions of the Code the question of title is relevant and the same erroneous assumption that a seller under an installment contract can, under the Code, retain something more than a "security interest", the same type of "interest" as held by all other creditors secured by the same collateral.
I realize that the cases from other jurisdictions are not controlling precedent for our decisions simply because they interpret the same Code. I mention the cases only to illustrate that the Code provisions we are interpreting are not ambiguous. I would also like to note that commentators on the Code also seem to have unanimously taken the view of Judge Wigginton. E.g., Smith, supra, 44 N.C.L.Rev. at 802-3; Henson, supra, at Sec. 5-4, p. 78. By reaching a contrary result, we are nullifying *46 the Legislative intent to adopt a simple, clear, and modern body of commercial law, uniform with that of other states, which will permit the expansion of customary commercial practices. We are also reaching an illogical and confusing result, which will cause unnecessary obfuscation of several other provisions of Article 9 of the Code.
Therefore, I dissent, and I would adopt the complete opinion of Judge Wigginton as to Question II.
BOYD, J., concurs.

ON REHEARING GRANTED
DEKLE, Justice.
The result reached herein does not, of course, prevent the earlier creditor who has an interest in after-acquired property (the bank) from proceeding against such property as its securing instrument and available statutes may allow; our delineation of the respective interests does control as to the extent of such a creditor's interest in that property. Part V of Ch. 679 (U.C.C.), F.S.A., extends procedures in some instances. In the event replevin is appropriate, new § 78.175 (1973) (former § 78.19(1)), F.S.A., when goods replevied have been retained or redelivered to a defendant on his forthcoming bond, explicitly deals with any limitation in the bank's interest. This section refers to a plaintiff's interest in the property as being based "on a claim of lien or some special interest therein," as would be the case, if replevin is well founded, as to the bank's interest in the property in question, being limited by our holding to its debtor's interest in the after-acquired property and not including the retained interest of the subsequent seller of that property who had failed to record his interest by timely filing his financing statement on the contract. Fla. Stat. § 78.175(1), F.S.A., spells out that the judgment shall be only for the lien or value of such special interest and Lazzari v. Gordon, 214 So.2d 102 (Fla.App.3d 1968), so holds.
The result of a replevin as to separate interests in the same chattels is not so clear in the instance of a judgment for a plaintiff when the goods have not been retained or redelivered to defendant. F.S. § 78.165 (1973) (old § 78.18), F.S.A., does not contain the "special interest" language of its following section 78.175, F.S.A. It may therefore follow where plaintiff has the property under replevin (§ 78.165) the subsequent creditor (petitioners), absent some agreement or equitable disposition as between the two creditors, would be required to pursue his own remedies available to such subsquent creditor for the retained value which was his. There does not appear to be any "third party claimant" statutory provision available in replevin, as is the case in attachment wherein F.S. § 76.21, F.S.A., provides for interposing a claim "in the manner provided in case of execution." Fla. Stat. § 56.16 et seq., F.S.A.
The petition for rehearing is otherwise
Denied.
ADKINS, C.J., and ROBERTS, ERVIN and McCAIN, JJ., concur.
BOYD and CARLTON (Retired), JJ., dissent.
NOTES
[1] Fla. Const., Art. V, § 3(b)(3), F.S.A.
[2] Cf. Mammoth Cave Production Credit Assoc. v. York, 429 S.W.2d 26 (Ky. 1968).
[3] Fla. Stat. § 679.312, F.S.A.