558 P.2d 1026
Francis M. WHITWORTH et al.,
Plaintiff-Respondents,

v.

Herman W. KRUEGER et al.,
Defendant-Appellants.

No. 12041.

Supreme Court of Idaho.

Dec. 28, 1976.

Clark Gasser, Ralph H. Jones, Jr. of Jones, Pomeroy & Jones, Pocatello, for defendant-appellants.

John K. Looze of Dial & Looze, Pocatello, for plaintiff-respondents.

SCOGGIN, District Judge (Retired).

This appeal involves two conflicting claims to the proceeds from the sale of a bankrupt's cattle. The district court held that the plaintiffs, who had sold cattle to the bankrupt and had filed a financing statement perfecting their security interest in the cattle sold and all cattle thereafter acquired as replacement for the cattle sold, had superior rights in the proceeds of the sale than did the defendants, who had placed 55 cows in the bankrupt's possession pursuant to an agreement which they had characterized as a "lease", but for which they had not filed a financing statement covering the cattle. We affirm the trial court's ruling that the plaintiffs' rights in the proceeds are superior to those of the defendants, but remand the case to the district court to conduct further proceedings to determine the extent of the plaintiffs' rights in the proceeds and to dispose of the proceeds in excess of the plaintiffs' claim to the bankruptcy court or the trustee in bankruptcy.

## THE STIPULATED FACTS

The parties submitted this matter to the district court sitting without a jury upon stipulated facts. The stipulations were to the following effect.

On February 3, 1969, the plaintiff respondents Francis M. and Wanda Whitworth, husband and wife, and Edgar L. and Lucina G. Whitworth, husband and wife, entered into an agreement with Del Mar and Elaine Cammack, husband and wife. The Whitworths sold the Cammacks 98 head of milk cows and some dairy equipment under a contract calling for a $5,000.00 down payment and semi-monthly installments of the remaining $39,500.00 to be paid over the following seven years. The contract of sale also provided that the Whitworths would have a lien upon the property sold and upon any replacements for these cattle that the Cammacks might later acquire. On February 6, 1969, the Whitworths filed a financing statement covering their security interest in the dairy equipment and the cows.

On June 3, 1971, the defendant respondents Herman W. and Josie Krueger, husband and wife, entered into an agreement with the Cammacks. This agreement, which the parties denominated a "lease", called for the Kruegers to turn over possession of approximately 55 head of dairy cattle to the Cammacks. These cattle bore the Kruegers' registered brand. The agreement called for the Cammacks to pay the Kruegers $450.00 a month for a five year term. At the expiration of this five year term, the Cammacks had an option to purchase the 55 head for $10.00. The market value of the 55 head was approximately $450.00 per head at the time the Cammacks and the Kruegers entered into their agreement. Barring unforeseeable calamity, the parties anticipated that the market value of the animals at the end of the five year period would have been no less than $200.00 per head. The Kruegers did not file a financing statement pursuant to the requirements of Art. 9 of the Uniform Commercial Code. They did, however, record the agreement.

The Cammacks defaulted upon their obligations to the Whitworths and to the Kruegers. On January 22, 1973, Del Mar Cammack was adjudicated a bankrupt. On April 11, 1973, the referee in bankruptcy granted the Whitworths' petition to reclaim 98 dairy cows from Cammack's estate. According to the complaint, only three of the cows that the Whitworths had sold to the Cammacks were still in their possession to be reclaimed, but at least 31 (34 according to the respondents' brief) of the reclaimed cows had been put in the Cammacks' possession by the Kruegers. (This information does not appear in the stipulation.)

The reclaimed cows were sold, but the state brand inspector refused to turn over the proceeds from the sale of the "leased" cattle to anyone but the registered owners, the Kruegers, without their permission or

without court order. The proceeds were then deposited with the clerk of the district court pending the court's determination of the Whitworths' interest in them.

The Whitworths maintain that they are entitled to $11,058.28 plus interest of the proceeds from the sale of these cattle, whereas the Kruegers maintain that they are entitled to the entire $14,850.00 proceeds. The Whitworths argue that they have priority to the proceeds because both of the parties' agreements with the Cammacks created security interests subject to the provisions of the Uniform Commercial Code and the Whitworths had perfected their security interest in the cattle by a proper filing under the Code, but the Kruegers had not. The Kruegers, on the other hand, argue that their "lease" was not subject to the terms of the Uniform Commercial Code and that they had protected their interest in the cattle by recording their agreement with the Cammacks and by branding the cattle with their registered brand. The district court entered judgment that the Whitworths were entitled to satisfy their claim against the Cammacks from the proceeds from the sale and that the Kruegers were entitled to the excess. The Kruegers appealed.

## THE PRIORITY OF THE CREDITORS' INTERESTS

Both parties agree that the Whitworths had a perfected security interest in the cattle with a priority from the time of filing pursuant to the requirements of Art. 9, §§ 28–9–101 to –9–503, of the Uniform Commercial Code, I.C. §§ 28–1–101 to –10–104. The question presented is whether the Kruegers were required to file a financing statement pursuant to Art. 9 of the Uniform Commercial Code in order to protect their interest in the cattle.

Under the Uniform Commercial Code, if the Kruegers' agreement with the Cammacks was an installment sales contract, the Kruegers could have perfected a security interest in the goods with a priority superior to that of the Whitworths by filing within ten days after possession

passed to the Cammacks. I.C. § 28–9–312(4). However, having parted with possession of the goods and not having perfected a security interest in the goods by filing, the Kruegers' interest in the goods would be subordinate to the Whitworths'. I.C. §§ 28–1–201(37), 28–2–401(1), 28–9–113, 28–9–312. But the fact that the Kruegers' agreement was entitled a "lease" rather than an "installment sale contract" does not mean that the Kruegers were not subject to these provisions of the UCC. In circumstances where the "lease" gives the "lessee" the option to acquire the "leased" goods at the expiration of the "lease" term without additional consideration or for nominal consideration, i. e., where the "lease" is commercially indistinguishable from an installment sales contract, I.C. § 28–1–201(37) provides that a "lessor's" interest in "leased" goods is a security interest:

> " 'Security interest' means an interest in personal property or fixtures which secures payment or performance of an obligation. . . . Unless a lease or consignment is intended as security, reservation of title thereunder is not a 'security interest' . . . . Whether a lease is intended as security is to be determined by the facts of each case; however, . .
> (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security."

In this case the Cammacks had the option at the expiration of the "lease" term to purchase for the sum of $10.00 cattle which the parties had anticipated at the beginning of the term would be worth over $10,000.00 at the end of the term. This is clearly nominal consideration; therefore, under I.C. § 28–1–201(37), the agreement between the Kruegers and the Cammacks was one intended for security and the Kruegers' interest in the cattle was a security interest. *Peco, Inc. v. Hartbauer Tool & Die Co.,* 262 Or. 573, 500 P.2d 708 (1972). Accordingly, because the Kruegers' interest in the cattle was a security interest, by failing to perfect

that interest the Kruegers' interest became subordinate to the Whitworths' perfected interest.

The Kruegers argue, however, that these sections of the Uniform Commercial Code do not apply to their agreement because there is another section of the Idaho Code, I.C. § 25–2001, which specifically deals with leases of livestock, and this section, rather than sections found in the Uniform Commercial Code, should control. This section provides:

"25–2001. *Leases to be in writing and recorded.*—All leases of more than ten (10) head of livestock must be in writing and must be acknowledged in like manner as grants of real property, and filed of record in the same county recorder's office or offices, and within the same time and manner, and for the same fee, as are chattel mortgages; and the failure to comply with the provisions of this section renders the interest of the lessor in the property subject and subsequent to the claims of creditors of the lessee . . . ."

The Kruegers argue that they protected their interest in the cattle by recording pursuant to the requirements of this section. We do not believe that the Kruegers' recording protected their interest in the cattle as against the Whitworths. The Kruegers' agreement falls under the filing provisions of the Uniform Commercial Code because I.C. § 28–1–201(37) brings under its terms all agreements, regardless of their title, which are commercially indistinguishable from installment sales contracts. The Kruegers' agreement was a "lease" of this kind, not an agreement in which the parties' reasonable business expectations were that the cattle would be returned to the Kruegers at the expiration of the lease term. Agreements of the latter kind would be without the scope of I.C. § 28–1–201(37) and within that of I.C. § 25–2001, but the Kruegers could not bring this agreement within the scope of I.C. § 25–2001 by entitling it a "lease" when it was commercially identical to an installment sales contract. Therefore, the recording of the agreement

as if it were a "lease" did not protect the Kruegers' interests in the cattle as against the Whitworths.

Finally, the Kruegers argue that the trial court's decision has implicitly repealed the state brand laws. We do not believe this is the case. The state brand laws, the bulk of which are found in chapter 12 of Title 25 of the Idaho Code, are principally concerned with brands as indicia of title to livestock. However, in I.C. § 28–9–202, Art. 9 of the Uniform Commercial Code provides that:

"28–9–202. *Title to collateral immaterial.*—Each provision of this chapter [chapter 2 of Art. 9, concerning the validity of security agreements] with regard to rights, obligations and remedies applies whether title to collateral is in the secured party or in the debtor."

Thus, title, or indicia of title such as a brand, is immaterial in determining the rights of the parties because their rights are determined solely by the nature of their security interest and the priority of their security interest. Therefore, the brand upon the cattle in question does not bear upon the rights of these parties in this case.

### PROCEEDINGS UPON REMAND

The record before us contains the following order by the referee in bankruptcy:

"IT IS HEREBY ORDERED:

"1. That leave is hereby granted to such creditor [the Whitworths] to reclaim upon the property below described,

"Ninety-eight (98) head of cows.

. . . . .

"3. That the creditor account to the bankruptcy court or its trustee if a surplus should arise from sale; creditor shall forthwith pay said surplus to the bankruptcy court or its trustee.

"4. Except as herein reserved, the court does hereby divest itself of further jurisdiction over said property and same shall not be considered a part of the bankrupt's estate." Clk.Tr., pp. 12–13.

The stipulation before this Court does not state that all of the secured assets (the dairy equipment and cattle) of the

Cammacks available to be reclaimed or liquidated in satisfaction of the Whitworths' debt have been reclaimed and liquidated, or that all the secured assets which were available to the Whitworths have been applied in satisfaction of that debt. The Whitworths' entitlement to the proceeds from this sale cannot exceed that amount necessary to satisfy their secured claim against the Cammacks because they must account to the bankruptcy court or the trustee for any surplus in excess of that claim. Thus, upon remand the court must satisfy itself of the Whitworths' entitlement to the amount of the proceeds they claim before distributing that amount to the Whitworths.

It also appears from the record that the bankruptcy court initially decided that the Whitworths were entitled to the possession of the cattle and relinquished its jurisdiction over them, but retained jurisdiction over any proceeds in excess of the Whitworths' claim by ordering that any surplus be paid to the bankruptcy court or the trustee. Upon remand, the trial court must account for any surplus to the bankruptcy court or the trustee, not to the Kruegers as it ordered in its judgment.

Costs to respondents.

DONALDSON and SHEPARD, JJ., concur.

McFADDEN, Chief Justice, specially concurring.

I concur with the reasoning and result contained in the majority opinion. However, the dissenting opinion raises several arguments concerning the assumptions underlying the majority opinion. While I do not agree with the position of the dissent, I believe its arguments require additional discussion as set forth in this concurring opinion.

The majority opinion assumes that the Whitworths have a valid security interest in the after-acquired cattle of the Cammacks, including those purchased from the Kruegers. The thrust of the opinion is the question of whether the Krueger lease constituted a security interest so as to require perfection by filing under the terms of the Uniform Commercial Code, Article Nine. The majority concludes that the lease is a security interest. This conclusion is sound and I concur, as does the dissent. The majority then assumes that the Kruegers failed to perfect that interest by filing, and that their interest is junior to the Whitworths'. The dissent attacks the two assumptions embodied in the majority opinion: that the Whitworths have a valid security interest in after-acquired cattle (Parts I and II of the dissent), and that the Krueger interest is unperfected (Part III of the dissent).

I. IDENTIFICATION OF COLLATERAL IN THE WHITWORTH AGREEMENT: WAS A VALID "AFTER ACQUIRED" SECURITY INTEREST CREATED?

*A. Summary of Dissent Arguments*

In Parts I and II, the dissent objects to the majority opinion's assumption that the Whitworth agreement created a valid security interest in cattle subsequently acquired by the Cammacks, i. e. the cattle purchased from the Kruegers. The dissent first argues that the description of the collateral in the Whitworth agreement was insufficient to create a valid security interest, as it does not reasonably identify the collateral. I.C. § 28–9–110; *United States v. Mid-State Sales Co.*, 336 F.Supp. 1099 (D.Neb.1971). The dissent then turns to the "after-acquired" aspect of the Whitworth agreement. The language contained in that agreement reads:

"Buyers agree to grant t [sic] Sellers a lien upon said property [cattle] and upon the *replacements* therefore * * *"

This lien upon "replacements" follows an agreement by buyers to maintain a herd size at least equivalent to the number of cattle sold and secured in the agreement. The dissent argues that the use of the term "replacements" is not adequate to create an "after-acquired" security interest. Creation of an after-acquired right requires a "clear expression" of the intention, "manifest from the language of the instrument." *Poage v. Co-operative Pub. Co.*, 57 Idaho

561, 66 P.2d 1119 (1937). A right in after-acquired assets is not to be inferred. *In Re Middle Atlantic Stud Welding Co.,* 503 F.2d 1133 (3d Cir. 1974). The word "replacement" has no legal significance, and does not create an after-acquired right.

The majority opinion does not discuss these issues. However, I believe the arguments can and should be answered, in reaching the result found in the majority opinion.

### B. An Overview of Livestock Financing, and the Whitworth Agreement

One of the avowed purposes of the Uniform Commercial Code is "to permit the continued expansion of commercial practices through *custom, usage,* and agreement of the parties." (Emphasis added.) I.C. § 28-1-102(2)(b). Thus, consideration of the place of security interests in after-acquired livestock in the farm industry is proper in construing the Whitworth agreement.

Security interest financing of livestock herds involves special problems resulting from the unique nature of the collateral involved:

"Dairy cattle, beef cattle, hogs and sheep are all valuable assets available as collateral for the farm loan. Except for the dairy herd and perhaps sheep, it is the kind of collateral which is held for sale. *Even the dairy herd is a constantly changing asset.* Poor producers are culled and *replaced.* New acquisitions result from purchases or birth. Male increase is sold to meat packers while female increase will likely be retained in the herd." (Emphasis added.) Coates, Farm Secured Transactions Under the UCC, Vol. 1B, Bender's UCC Service (1976).

The nature of the assets requires special considerations in managing the collateral.

"From an economic standpoint, the secured party should encourage *replacements* in the dairy herd. Anything that improves the condition of the herd increases the income of the farmer. When a cow is diseased or reaches an age when it no longer is profitable to keep her or if the farmer wants to increase butterfat content, changes are in order. These decisions can best be made by the farmer." Coates, *supra.*

Thus, the security interest arrangement must allow the collateral to change as farming exigencies demand, while protecting the secured party. The economics of financing livestock then makes the after-acquired security interest critical. As the Wisconsin Court noted:

"Prior to the code, it was almost impossible for a lender to maintain in farm financing a valid security on a herd of cattle which was being sold or renewed. \* \* \* In order to give more flexibility to such financing, the code freed the debtor from strict accountability to the secured creditor for the property secured \* \* \* and recognized the validity of a secured interest in after-acquired property. Thus a debtor is now able to commingle his property and use it to his best interest, and the acquiescence of the secured creditor under an after acquired clause in such a program by the debtor does not invalidate the security interest of the creditor." *Burlington Nat'l Bank v. Strauss,* 50 Wis.2d 270, 184 N.W.2d 122, 124 (1971).

The scheme envisioned by the Whitworth contract seems to coincide exactly with that described by the Wisconsin court. Taking the Whitworth contract as a whole, the following picture emerges. The Whitworths desired to sell a herd of cattle to the Cammacks, and agreed to carry the financing. In extending credit to the Cammacks, the Whitworths sought to secure the debt by placing a lien over the Cammack herd, while allowing the Cammacks to manage the herd, and buy and sell cattle as necessary, without jeopardizing the security interest. To this end, the agreement provides that

"Buyers shall have the right to sell cows that cease to be productive or to otherwise cull the herd; but they shall at all times retain a sufficient number of replacement heifers, or otherwise provide

satisfactory replacements, to maintain a herd not smaller than that being now purchased by said Buyers, hereunder."

The Whitworths then assured the safety of their security interest by placing a lien on those cows brought in to maintain the herd size: "Buyers agree to grant to sellers a lien upon said property and upon the replacements therefore * * *" From a consideration of the *entire* instrument, it is apparent that the Whitworth agreement embraces the optimal farm financing practice, and exploits the code's unique advantage for livestock financing:

> "The use of livestock as collateral has been improved by the Code. By the use of an after-acquired clause, the entire herd can be covered without specific identification of each animal." Coates, *supra.*

### C. Adequacy of Collateral Description

 The dissent cites the *Mid-State Sales* case for the proposition that the collateral was inadequately described. In that case, the language granting the alleged after-acquired right reads "fifty-one head of Holstein Heifers with increase." That language is compared to the Whitworth document which reads "84 Holstein Cows and 14 Holstein Heifers, 1 to 2½ years of age [and replacements]." The court in *Mid-State* does not find the language so inexact as to void the agreement, however. It only finds it questionable enough so as to require a more exacting burden of proof. Further, the *Mid-State* decision is questionable authority. Generally, floating lien situations should not require great specificity in description:

> "To date, the relatively few courts which have had occasion to pass on the sufficiency of description in a financing statement, have, for the most part, been willing to follow the admonition of the Code drafters. Adverting to the functional approach taken by the code, they have generally permitted the use of broad indefinite descriptions. * * * [F]loating liens and after-acquired property aspects of inventory and accounts receivable financing make mandatory the use and ju-

dicial validation of very broad descriptions * * *" Comment, 48 Denver L.J. 146 (1971).

Livestock descriptions of a general nature are usually held valid:

> "The problem of sufficient description of livestock as collateral has been the subject of litigation, but the courts have been lenient towards secured creditors and have found sufficient description such as 'all livestock' reasoning that creditors have been put on notice of a security interest." Miller, Farm Collateral under the UCC, 20 S.Dak.L.Rev. 514, 523 (1975).

Requiring specific identification of collateral animals would subvert the advantage of livestock financing allowed by after-acquired finance clauses by limiting the ability of the debtor to alter his herd. Coates, *supra.* Thus, general descriptions are not uncommon. *In re Malzac,* 14 UCC Rep. 1223 (D.C.Vt.1974); *Barth Bros. v. Billings,* 17 UCC Rep. 237, 68 Wis.2d 673, 227 N.W.2d 673 (1975).

Some specificity is inferable from the agreement. The Whitworths intended to secure all cattle up to the number of the herd sold. Thus, the intended security was based on all cattle purchased to bring the herd up to the required size, i. e. replacements for any lost cattle which reduced the herd size below the required number.

### D. "Replacement" as After-Acquired

 The dissent next argues that the use of the term "replacement" is not adequate to create an after-acquired right. As a general rule, creation of an after-acquired right does not demand the use of any special language.

> "It is not necessary that the security agreement or the financing statement use the words 'after-acquired property.' Where a reasonable man, looking at the description of the collateral, would recognize that it was intended to extend to *replacements or additions,* the security interest will have that effect." (Emphasis added.) Anderson U.C.C., Vol. 4, p. 181, § 9–204:9 (1971).

The word "replacement" appears to be commonly used in the creation of livestock after-acquired rights. See, *United States v. Pete Brown Enterprises*, 9 UCC Rep. 734, 328 F.Supp. 600 (N.D.Miss.1971); *Erb v. Stoner*, 1 UCC Rep. 469 (Pa.Ct.Comm.Pl. 1959); *United States v. Pirnie*, 339 F.Supp. 702 (D.C.Neb.1972); Coates, *supra*. These cases use the word "replacement" in conjunction with other after-acquired language and are not cited for the proposition that the word "replacement" alone is sufficient to create an after-acquired right. Rather, they show that the word *does* have a meaning commonly known to create one of a number of different after-acquired rights. As is noted below, the word limits the after-acquired right to only certain after-acquired cattle. In this sense, it means cattle brought in to maintain herd size, as opposed to additions. To construe "replacement" to mean a specific cow brought in to take the stall once occupied by "Old Bessie" does not appear to be a reasonable construction in view of common farm livestock practices; cattle farmers do not buy 50 head of new cattle to replace lost friends. "Replacement" as it is used in the livestock context more probably refers to stock acquired to maintain herd size when other stock is lost from the herd. This is exactly what the Whitworth agreement seeks to do: maintain a herd size adequate to secure the debt.

In this sense, it is important to realize that "after-acquired" is *not* freely interchangeable with "replacement." Had the term "after-acquired" been used, it would have included *all* subsequently purchased cattle, *ad infinitem*. The Whitworths desired only to assume a security interest in the specified herd size. Thus, the use of "replacement" was more appropriate. To argue, as the dissent does, that no after-acquired right was intended because "it would have been a simple matter to have used 'after-acquired' language" is clearly erroneous.

Nor does the notion of replacement require some specific intent to replace lost cattle; the effect of replacement is adequate to subject the collateral to this after-acquired security interest. To require the debtor to intend to replenish his herd would be to allow the debtor to decimate the floating lien by selling all the secured cattle and then purchasing others without "intending" a replacement. Thus, the mere happening of a replacement subjects the collateral to the after-acquired clause; it is not necessary that there be evidence that the Cammacks specifically sought to replace the Whitworth cattle with those acquired from the Kruegers.

The dissent cites the *Poage* case for the proposition that the intent to create an after-acquired right must be manifest from the instrument language. However, that case involved a document where the clause was clear, and the court merely endorsed the validity of the after-acquired clause. The case in no way attempts to create a minimum standard, as the dissent attempts to use the case.

The dissent further cites *Middle Atlantic Stud* and concludes that creation of an interest in after-acquired property must be explicit. In that case, the agreement was for a security interest in "all receivables." The question was whether this included after-acquired receivables, or only present receivables. In refusing to imply an after-acquired right, the court based their decision on the unique practices of accounts receivable financing. Thus, the case is distinguishable. Further, as Seitz, C. J., notes in his dissent in that case, the outcome is premised on pre-code hostility to floating liens which is inappropriate.

## II. FILING OF THE KRUEGER LEASE AS PERFECTION OF THEIR SECURITY INTEREST.

Assuming, as we do here, that the Krueger lease is a security agreement, then it is clearly a purchase money security agreement. I.C. § 28–9–107. As such, it would have priority over the Whitworth after-acquired right if it was perfected within 10 days after the date of its attachment, I.C. § 28–9–312(4). A copy of the lease was filed with the county recorder within that time. In Part III, the dissent argues that

the lease as written was sufficient to constitute a financing statement, and when it was filed, the Krueger interest perfected, thus giving them a priority over the Whitworth security interest.

Perfection by filing is designed to give inquiry notice of existing security interests. A potential creditor is charged with the task of going to the recorder's office to check whether the collateral is already encumbered. As the purpose of the financing statement is to put the creditor on inquiry notice, sufficient information must be contained to direct him to the first creditor so that he may determine the status of the collateral. Anderson, UCC, Vol. 4, p. 470 (1971). Filing of the lease could only be adequate if it accomplishes this goal.

The dissent assumes that when a lease is filed it is placed in the recorder's office such that a person searching for security interests could find it. However, the lease was filed pursuant to I.C. § 25–2001, and would be filed similarly to a chattel mortgage. That lease would not be indexed with financing statements. Indexing schemes are defined in I.C. § 31–2404. That section requires two indexes of leases, I.C. § 31–2404(8) and (9), and another index for UCC financing statements, I.C. § 31–2404(27). Thus, it can be assumed that the lease was not filed with financing statements, and a creditor looking for security interests by checking financing statements would not find the lease. At any rate, if a perfected interest was to be implied from the lease, it would be up to the Kruegers to prove that the lease was filed with the security interests. Thus, even if we do not assume that it was filed with the leases, it would still be necessary to find evidence that the lease was properly filed as an Article Nine security interest. There is no such evidence in the record.

We acknowledge that I.C. § 28–9–402(1) provides that a security agreement may be filed instead of a financing agreement. The dissent argues that this section validates the filing of the lease as perfecting the interest. This position misses the point. It is not *what* was filed that is objectionable; all else being equal, filing of the lease would be effective (subject to the address exclusion discussed below). What is inadequate is the *where* of the filing. We assume that when the lease was filed as a lease, it was indexed as a lease and to assume otherwise is unreasonable. Thus, it would not have been indexed in the Article Nine index provided for in I.C. § 28–9–403 and I.C. § 31–2404(27). The goal of the code is to allow an easy access to filed security interests. Reasonable diligence does not require a creditor to search through the lease indexes to find security interests. The lease, as a security interest, was presumptively filed in the wrong place. The instances in which the code excuses an improper *place* of filing are set forth in I.C. § 28–9–401(2). Two such allowances are noted and neither is applicable here.

Further, the code requires the address of the creditor and debtor, and the lease does not include their addresses. The address requirement is strictly construed, because the potential creditor must be able to know where to go to get further information. Thus, inclusion of only a city or county is not adequate; a mailing address is needed. See, *In re Lindley,* 12 UCC Rep. 1031 (D.C.Me.Ref.1969); *Mid-American Dairymen, Inc. v. Newman Grove Cooperative Creamery Co.,* 191 Neb. 74, 214 N.W.2d 18 (1974); *Burlington Nat'l Bank v. Strauss,* 50 Wis.2d 270, 184 N.W.2d 122 (1971). As Anderson, *supra* comments:

> "While only substantial compliance with the statutory form of financing statement is required, there is no substantial compliance if the statement omits the debtor's address. \* \* \* A financing statement is insufficient when it does not contain the address of the creditor. \* \* \* "

The dissent cites *Rooney v. Mason,* 394 F.2d 250 (10th Cir. 1968), for the proposition that omission of addresses from a financing statement is not fatal to the perfection. However, that case explicitly noted that the addresses were "readily attainable and known by virtually all of the credi-

tors." 394 F.2d 250, 253. It is not evident from the record that the Krueger or Cammack addresses were similarly known. Filing of the lease is not adequate to accomplish the notice required by the perfection sections of the code. It would be the Kruegers who are asserting a perfected prior security interest. The burden was upon them to demonstrate adequacy of the filing, and they failed to do so.

## III. "INTENDED RESULTS" VIS–A–VIS JUSTICE.

Running throughout the dissent, and especially apparent as the fourth part of that opinion, is the notion that the result reached in the majority opinion is somehow less than just, and is not the result intended by the code, the parties, or Shakespeare (we can be certain the Bard did *not* write the lines included in the dissent; perhaps it was Bacon?) Couched in terms of "penalizing" the Kruegers for "not filing a financial statement," the dissent seems to be chastizing the majority opinion for taking the "Krueger's cows" away from them. Cases cited in that section chide the "illogical" results of applying the code without reference to special circumstances of each case. The dissent attempts to distinguish the simple dairy farmer as "seller" or "buyer" from "lenders and borrowers," whom apparently are something different than simple farmers.

These arguments are overly simple. First, it is incorrect to characterize the cows as the "Krueger's cows." The lease giving the cows to the Cammacks, we conclude, was in actuality a disguised installment sales contract. After that sale, the cows no longer belonged to the Kruegers, they belonged to the Cammacks. The Kruegers did not have any special rights to the cows other than the security interest. Either Cammack creditor had an equal right to satisfy their debt by access to the Cammack cattle; the question is, given a limited number of cows, who wins? The provisions of the code required that the Kruegers simply check the county recorder to know whether the debt was secure. If not they had only to file a financing statement within 10 days.

Most importantly, it is apparent from the common usage of after-acquired clauses in livestock financing, that the Kruegers, as dairy farmers, should have known that the cattle they sold might be encumbered. A person familiar with cattle or livestock sales should know that any cattle sold might be already attached as collateral, under a common after-acquired clause.

The dissent contends that the drafters of the code never intended for an unfiled purchase money security interest to lose to an after-acquired interest, and that filing in such instances is unimportant as the secured party *prior* to the purchase money interest is not prejudiced as is a subsequent creditor. This assertion is contrary to Official Comments to the U.C.C. Section 9–312, Comment 3, discusses this outcome and policy behind it at length. See also, White & Summers, Uniform Commercial Code, p. 918 (1972). The after-acquired creditor, who loses his otherwise valid interest only because the new creditor is a purchase money financer, is nonetheless entitled to notice of his lost interest so that he does not rely on it. In fact, in some after-acquired versus purchase money conflicts, the new creditor must give direct notice to the old to have priority.

This case does not present an instance of manifest injustice for the Kruegers. It presents an instance where one or the other of the Cammacks creditors must lose. The Whitworths fairly and honestly attempted to protect their debt by securing it upon cattle (up to the herd size) which the Cammacks might purchase to replace lost members of their herd. It is as unjust to deny them the cattle upon which they meant to secure their debt, as it is to "penalize" the Kruegers for failing to file. The Kruegers should have known the danger of possible after-acquired clauses, should have checked to see whether a security interest in Cammack cattle was on file, and should have perfected their own interest. Given an equal right, justice-wise, to the Cammack cattle as between the Whitworths and the

Kruegers, and given that the Kruegers could have prevailed had they exercised the minimal diligence required by the Code, there is no injustice in holding them to the code's system of priorities. See, *North Platte State Bank v. Production Credit Assoc. of North Platte,* 189 Neb. 44, 200 N.W.2d 1 (1972), where a purchase money interest, in cattle, not perfected in 10 days, was defeated by a filed interest under an after-acquired clause.

The dissent prefaces its position on the statement that the result reached by the majority "would have been intolerable under the pre-Code law of Idaho, that it is palpably unjust, and that was not even within the contemplation of the winning party; it is a decision that finds no support in the Code itself." Hopefully, this special concurrence answers these objections. That the result would have been different under pre-Code law is irrelevant; we must deal with the legislatively established scheme of commercial law reflected in the adoption of the U.C.C. The injustice occurs only if the Kruegers have a greater right to the collateral than the other secured party, and no such special right is apparent. The assertion that the result was not contemplated by the Whitworths is puzzling; this thought is not indicated anywhere in the record. Most importantly, the result *is* reflected in the Code, and I believe appropriately so.

DONALDSON, J., and SCOGGIN, District Judge, concur.

BISTLINE, Justice, dissenting.

Shakespeare might lay out the plot for this litigation in two lines:

(Whitworth): I fear that thou has sold off cattle mine.

(Cammack): Fear not, the court may yet make Krueger's thine.

The Court, bedazzled by the titanic beauty of "The Code," should observe itself to be playing the role of Bottom the Weaver. The Kruegers' cows are to be awarded to Whitworths because, it is said, such a result is required by the law. I fear that Mr. Bumble, in his monthly law commentaries, will again find reason to say, "The law is an

ass." For what the majority does today is to reach a decision that would have been intolerable under the pre-Code law of Idaho, that is palpably unjust, and that was not even within the contemplation of the winning party; it is a decision that finds no support in the Code itself.

In order to award the proceeds from the sale of Kruegers' cattle-collateral to the Whitworths, the majority must find established these three propositions:

1) The Whitworths have a validly perfected security interest.

2) The Whitworths' perfected security interest reaches out to cover after-acquired cattle.

3) The Kruegers do not have a purchase money security interest in these cattle.

The majority accepts the first point as having been stipulated by the parties, totally omits any analysis of the second, and uncritically adopts plaintiffs' contention and the trial court's unsubstantiated conclusion with regard to the third. In my view, the majority is wrong on all three premises, keeping in mind, however, that a failure to establish any one of the three is necessarily fatal to the Whitworths' claim against the proceeds of Kruegers' cattle.

I. THE WHITWORTHS MUST FAIL IN ANY CONFLICT WITH OTHER SECURED PARTIES BECAUSE THEIR SECURITY AGREEMENT DOES NOT PROVIDE AN ADEQUATE DESCRIPTION OF COLLATERAL.

The conditions determining the "Validity of Security Agreement and Rights of Parties Thereto" are found in Part 2, Chapter 9, Title 28 of the Idaho Code. According to I.C. § 28–9–203(1)(b), a security interest is not enforceable "unless the debtor has signed a security agreement which contains a description of the collateral."

The test for "sufficiency of description," in turn, is spelled out in I.C. § 28–9–110:

"For the purposes of this chapter, any description of personal property or real estate is sufficient whether or not it is

specific if it reasonably identifies what is described; . . . ."

On the matter of identifying the collateral, the two agreements before us are materially different. While the Krueger agreement describes the collateral only as "cows," it goes on to identify the same as to age and *brand*. Indeed, the Krueger agreement described its collateral with such sufficiency that the parties were later able to agree, and did agree, that it was identifiably cattle which were initially Kruegers that are the focal point of this controversy.

By contrast, the Whitworth agreement describes the collateral as Holstein cows and heifers, but identifies only the heifers, and these but as to age. Entirely absent is any identification by brand.

Under the provisions of I.C. § 25–1201 and I.C. § 25–1202, the Whitworths were required to have used a brand on their dairy livestock. Under the provisions of I.C. § 25–1208, a recorded brand is personal property, and, as such, is subject to sale, assignment, transfer, devise and descent. Under I.C. § 25–1204, brands are required to be recorded with the state brand inspector, failure to do so resulting in a prohibition of using the brand as evidence of ownership. I.C. § 25–1211 makes further provision that in court proceedings involving the title or right of possession of an animal, the brand, earmark, or ear tag shall be *prima facie* evidence that the animal belongs to the owner of the brand, earmark, or ear tag, conditioned upon recording. Proof of the right to the use of the brand, earmark, or ear tag is made by production of a certified copy of the recording.

It is abundantly clear that, until today, Idaho has recognized branding as both proper *and necessary* to identification of livestock. Undoubtedly, it was for this reason that the state brand inspector refused to turn over the proceeds from the sale of the "leased" cattle to anyone but the registered brand owners, the Kruegers, without their permission or without a court order. While the majority opinion declares that it does not implicitly repeal the state brand laws, two sentences later, however, follows

this: "a brand, is immaterial in determining the rights of the parties because their rights are determined solely by the nature of their security interest and the priority of their security interest."

In short, the state brand laws are not repealed; they are just irrelevant. I would hold rather that the state brand laws and the U.C.C. complement one another, and that the two can blend harmoniously by incorporating pre-Code methods of identification of cattle as the preferred "sufficiency of description" demanded by the Code whenever the collateral happens to be cattle.

A recent collateral-identification case in point is *United States of America v. Mid-States Sales Company*, 336 F.Supp. 1099 (D.Neb.1971). The United States was the institution lender, financing one Vencill under its Farmers Home Administration program. The United States secured itself by taking a lien on "All livestock . . . now owned or hereafter acquired by Debtor, together with all increases, replacements, substitutions, and additions thereto . . . ." The requisite financing statements were filed.

Thereafter, Mid-States made two sales to Vencill, both by purchase money mortgages. The ensuing controversy revolved around the description of the collateral set forth in Mid-States' security agreement, and its later attempt to identify the collateral against which it claimed its security interest. The United States agreed that its general lien would be subordinate to the purchase money security interest of Mid-States, *providing* the latter's identification passed muster.

Mid-States' first security agreement described its collateral simply as "fifty one (51) head of Holstein heifers with increase." The second agreement claimed as collateral "twenty four Holstein heifers with increase." The descriptions are remarkably similar to those used by the Whitworths in describing their collateral as, "85 Holstein cows, 14 heifers, 1 to 2½ years of age."

The court declined to rule that the description was so inexact as to render the

security agreement void. But the descriptions were *"sufficiently uncertain"* as to cast "a substantial burden" upon Mid-States to be able "clearly" to identify its collateral in order to prevail over the government. Mid-States was unable to meet this burden and thus was required to suffer the consequences of its doing "nothing at the time of the making of the security agreement with Vencill to *assure future ability to identify* the specific cattle being mortgaged."

The point was that a party intending to create a security interest in certain cattle, necessarily must realize that one day he may be in the position of having to identify the cattle against which he claims the lien of his security agreement operates. Unless a given Holstein dairy cow has two heads, or some other recognizable identifying feature, later picking that cow out of a herd of one thousand or even out of one hundred is just not realistic.

In reaching a decision on the sufficiency of description of Whitworth's collateral, a decision which is to be made as of the time of filing, I would hold that ordinary business prudence dictates that security agreement descriptions involving cattle should include setting forth the brand, and/or earmarks, and/or ear tags, thereby fulfilling the requirement of reasonable identification. Since the Whitworths failed to provide such reasonable identification, I would hold that they do not possess a security agreement which is enforceable as against third parties.

II. EVEN IF THE WHITWORTHS' SECURITY AGREEMENT IS VALID, THEIR CLAIM MUST STILL FAIL BECAUSE IT LACKS AN AFTER–ACQUIRED PROPERTY CLAUSE.

The Whitworths argue that their transaction with the Cammacks gave rise to two types of security interests: a purchase money security interest in the animals transferred, *and* "an interest in the subsequent cattle purchased to keep the herd up to 98 head." It is not entirely clear whether the majority simply accepts this contention of the Whitworths, or, perhaps, fails to note that two analytically distinct claims are being made. In language that I find troubling, the majority concludes:

"Both parties agree that the Whitworths had a perfected security interest in *the* cattle."

This, I believe, is erroneous. What the Kruegers stipulated to was only that the Whitworths "filed a Financing Statement as Instrument Number 457961." The Kruegers did *not* agree that the Whitworths had thereby perfected a security interest—much less one that could reach out to all after-acquired cattle from whatever source, and at whatever time acquired, perhaps, even when Cammacks may have had on hand more than 98 head of original Whitworth cattle, or their increase.

The majority's use of the phrase, *"the* cattle," blurs these distinctions and becomes all-inclusive as to any cattle which happened to be on the Cammack ranch at the time of the bankruptcy, irrespective of whether the same were initially Whitworths', or Kruegers', or some other person's or persons'. This, I believe, begs the very question under consideration here, namely, *did any lien·which may have been created by the Whitworth security agreement attach to cattle which were afterwards acquired by the Cammacks from the Kruegers?*

The specific wording of the lien-granting provision of the Whitworth agreement is this:

"Buyers agree to grant t (sic) Sellers a lien upon said property and upon the *replacements* therefor, if any." (Emphasis supplied.)

The not insignificant problem with the Whitworth contention is that nothing in the record shows, or even infers, that the Krueger cattle, or any portion thereof, were in actuality "replacements" for any of the Whitworth cattle. This being a crucial element of the Whitworth case, it is reasonably inferred that Krueger cattle were *not* replacement cattle, or that the Whitworths were unable to develop any evidence to show that they were, if, in fact, such were

the case. Had the Krueger cattle been replacement cattle, it would seem to have been an easy matter for Whitworths to have said so, and better yet, to have obtained from the Cammacks an affidavit to that effect.

What the Whitworths would have this Court do, and what the majority is doing, is to elevate the narrow and specific *replacement clause* into a general *after-acquired property clause*. With this I can not agree; no other court appears to have ever done so; the two are not synonymous, but have entirely different meanings.

The word "replacement" is not one peculiarly adapted to the legal profession. It is not to be found in the law dictionaries, but is a word of common usage. According to Webster's Third International Dictionary (1967), "replacement" is defined as something which replaces, a substitute, a new fixed asset or portion of an asset that takes the place of a discarded one. The word "replace," as most appropriate to the use here made of that word, implies supplying a substitute or equivalent for something lost, worn out, destroyed, or no longer usable. The Whitworths' own gloss on the term, taken from their security agreement, is as follows:

"Buyers shall have the right to sell cows that cease to be productive, or to otherwise cull the herd, but they shall at all times retain a sufficient number of replacement heifers, or otherwise provide satisfactory replacements, to maintain a herd not smaller than that being now purchased by said Buyers, hereunder."

The obvious contemplation of the parties, as manifest in their signed agreement, was that such "replacements" would be heifers "retained" from the calf crop which a dairy operation necessarily produces each year. Almost as an after-thought, if particular replacements were provided otherwise, a lien was also granted as to these.

By contrast, "after-acquired property" is a technical phrase, one that has acquired technical precision through decades of use in the Idaho courts. Liens on after-acquired property were not unknown in Idaho in pre-Code days, Idaho did not share the deep-seated antipathy of other jurisdictions to after-acquired property clauses. Such jurisdictions adhered to this rule as stated in American Jurisprudence:

"A mortgage which purports to cover all the property which the mortgagor may thereafter acquire, without any restriction as to its amount, character, or the uses and purposes for which, or the time within which, it is to be acquired, or as to the locality where it is to be placed, is void for indefiniteness." 15 Am.Jur.2d, Chattel Mortgages, After-Acquired Property, § 67, at 261 (1964).

The Idaho case of *Poage v. Co-operative Pub. Co.,* 57 Idaho 561, 66 P.2d 1119 (1937) is a leading case. It is cited in the above section of American Jurisprudence Second, for the proposition that such mortgages, on after-acquired property, will be upheld where there is found a clear expression of the "intention of the mortgagor to cover such property."

Whatever the law may have been in other jurisdictions, it is thus clear that in Idaho after-acquired property provisions of chattel mortgages were held valid. It is equally clear, and beyond question, that whether or not personal property afterwards acquired was subject to the lien of the mortgagee was to be determined according to the intention of the parties as "*manifest from the language of the instrument.*" *Poage v. Co-operative Pub. Co., supra,* 57 Idaho at 582, 66 P.2d at 1128. While the advent of the Code has drastically changed the law in many jurisdictions as to the validity of such after-acquired property provisions—See, "Comment" to I.C. § 28–9–204(3)—the Code in this respect wreaks no such havoc in Idaho. The Code recognizes only that which Idaho has long recognized in the field of institution financing, to wit: if the parties expressly manifest their intention to encumber assets which the borrower will later acquire, Idaho courts will enforce the agreement expressing that manifestation.

Thus the Code does not require any departure whatever from the rule of the *Poage* case. If the Whitworths and the

Cammacks actually intended that the Whitworths should have a lien on personalty which the Cammacks would thereafter acquire, it would have been a simple matter for them to have used language appropriate for that purpose. This they did not do.

The recent case of *In re Middle Atlantic Stud Welding Co.*, 503 F.2d 1133 (3rd Cir. 1974), is very much on point. In this case, a borrowing situation was involved. Both the referee and the district court made the specific finding that the lender and the debtor intended the agreement to establish a security interest in after-acquired accounts receivable. Nonetheless, both held, and the circuit court affirmed, that, such intention notwithstanding, absence of *explicit* reference to after-acquired accounts defeated the lender's claim of a security interest against accounts which were in fact afteracquired.

Involved was the law of Delaware, which at that time had adopted the Code, with a provision identical to our I.C. § 28–9–204(3):

". . . a security agreement may provide that collateral, whenever acquired, shall secure all obligations covered by the security agreement."

The security agreement in *Middle Atlantic* granted a security interest in "all Receivables and proceeds thereof as security for the Liabilities," and defined "receivables" as "all of Debtor's Accounts Receivable." "Liabilities" was defined to mean "any and all indebtedness of Debtor to Secured Party of every kind and description, now existing or hereafter arising." Arguably, such language should suffice to alert readers of the security agreement to the fact that afteracquired accounts were intended to be included. The Court of Appeals of the Third Circuit rejected the argument:

"Although it may be true that many, perhaps most, prospective lenders, on reading the present agreement, would obtain an unambiguous explanation of its full meaning from the secured party, some might be misled and proceed without inquiry. *The ease with which a secured party could eliminate the danger of mis-*

*leading any reasonable subsequent lender suggests that in administering the Code the courts should require him to do so. A requirement that intended inclusion of after-acquired accounts receivable be unambiguously expressed will not significantly conflict with any important Code policies,* and will support some. It will produce simpler, clearer and more certain law for all parties.

"This appeal involves a question as yet infrequently adjudicated. Hence, our decision here cannot disturb any generally understood judicial interpretation of the Code. Affirmance will not require a return to the law of magic words. Neither will it go to the opposite extreme of flexibility urged by the appellant. It will be in keeping with the observation in the Comment to section 1–102, supra, that a degree of strictness in construction, as well as flexibility has proper application under the Code.

"Last, this decision respects reasonable commercial need and expectation. *The validity of after-acquired property clauses is recognized. Only the implication of such a clause through ambiguous language is rejected.* It is hard to see how such implication would promote satisfactory conduct of business affairs." (Emphasis added.) *In re Middle Atlantic Stud Welding Co.*, supra, 503 F.2d at 1137.

*Middle Atlantic*, of course, dealt with accounts receivable. This context has for years been the particular province of the "floating lien" concept. Obviously, such a lien *must* float if it is to be secured by the ever-changing stream of inventory or accounts receivable. Still, the court insisted upon strict compliance because,

". . . it is neither onerous nor unreasonable to require a security agreement to make clear its intended collateral."

*A fortiori*, this court should insist upon an adequate description of collateral and an explicit claim on after-acquired property when the collateral in question is dairy cows.

III. EVEN WERE THE WHITWORTHS TO POSSESS A VALID SECURITY AGREEMENT AND A VALID AFTER–ACQUIRED PROPERTY CLAUSE, THEIR CLAIM MUST STILL FAIL BECAUSE THE KRUEGERS PERFECTED A PURCHASE MONEY SECURITY INTEREST.

It is the policy of the Code, as also of pre-Code law, to prevent a secured party with an after-acquired property claim from exercising a strangle-hold upon the debtor. The debtor's credit would dry up entirely if all subsequent creditors had to subordinate their advances to a prior floating lien. Thus, corresponding to the pre-Code conditional sales contract, the Code creates the category of the "purchase money security interest," which is defined in part as follows:

"A security interest is a 'purchase money security interest' to the extent that it is

"(a) taken or retained by the seller of the collateral to secure all or part of its price; . . ." I.C. § 28–9–107.

Inclusion in this privileged category assures the party with the purchase money security interest that his collateral is safe from the grasp of all prior creditors. This policy is enunciated in I.C. § 28–9–312(4):

"A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within ten (10) days thereafter."

The all important question thus becomes: Do the Kruegers have a perfected purchase money security interest? If they do, they are entitled to all proceeds from the sale of their collateral, regardless of any interest the Whitworths may have.

Analysis may properly begin by observing that there is no question that the Kruegers have "the three basic prerequisites to the existence of a security interest: agreement, value, and collateral." I.C. § 28–9–204, Comment 1. The only issue is whether or not the Kruegers have met the Code's requirement that a financing statement be filed to perfect a security interest. I.C. § 28–9–302(1). The "formal requisites" may be summarized as follows:

(1) The filing of a financing statement.

(2) The signatures of the debtor and of the secured party.

(3) The addresses of the debtor and of the secured party.

(4) A description of the collateral.

*See,* I.C. 28–9–402(1).

As noted earlier, condition (4)—i. e., the description of collateral in the Kruegers' security agreement—is fully satisfied. It is equally clear that the agreement contains the signatures of both the Kruegers and the Cammacks, thus fulfilling condition (2). If the majority is to hold that the Krueger's security agreement is unperfected, then, it must either be

(1) because the Kruegers' security agreement cannot take the place of a financing statement; or

(3) because the addresses of the debtor and of the secured party might be said to be substantially insufficient.

Neither challenge can withstand close analysis.

(1) The Code itself provides that the secured party may file a financing statement, as such, *or* he may file a signed copy of the security agreement—so long as the latter contains at least the same information as is required in a financing statement:

"A copy of the security agreement is sufficient as a financing statement if it contains the above information and is signed by both parties. I.C. § 28–9–402(1)."

The accompanying Comment by the drafters of the Code reiterates their approval of this practice:

"A copy of the security agreement may be filed in place of a separate financing statement, if it is signed by both parties and contains the required information."

Given this clear language of the Code and the Comment, it needs must follow as the night the day that Kruegers' security agreement suffices to serve in place of the

financing statement required by I.C. § 28–9–402(1).

(3) The adequacy of the addresses of the secured party and of the debtor alone remains at issue. Case law on this question is about evenly divided, with some courts adhering to the literal requirement of addresses and other courts dispensing with this requirement. *Mid-America Dairymen, Inc. v. Newman Grove Cooperative Creamery Co.*, 191 Neb. 74, 214 N.W.2d 18 (1972).

The inquiry to be made in deciding between the vying authorities, finds its guide in I.C. § 28–9–402(5) which qualifies all the preceding "formal requisites":

"A financing statement substantially complying with the requirements of this section is effective even though it contains minor errors which are not seriously misleading."

The Comment provides further assistance:

"Subsection (5) is in line with the policy of this Article (Chapter) to simplify formal requisites and is designed to discourage the fanatical and impossibly refined reading of such statutory requirements in which courts have occasionally indulged themselves."

The question, then, is properly treated as one of fact. What is seriously misleading in inventory financing may not be so in cattle sales; what is seriously misleading in dealings among lending institutions may not be so between dairy farmers; what is seriously misleading in Ada County, may not be so in less populous Owyhee County. Each case must be determined on its own facts.

In *Rooney v. Mason*, 394 F.2d 250 (10th Cir.1968), the appellant contended that the "Notice of Agreement" there filed was defective because it did not give the mailing address of either the debtor or the secured party. The Circuit Court took note of the Code provisions cited above and held that:

". . . the purpose of § 34–9–402 is to establish a notice system of recording and that the notice may be such as to require a creditor to make further inquiry. The Wyoming Courts might reasonably hold that a creditor examining the records is put on notice to make further inquiry

upon seeing the notice of agreement. Further, the fact that the addresses of both parties were readily available and known by virtually all creditors could reasonably be found sufficient to make unnecessary the listing of the addresses of the parties." 394 F.2d at 253.

This approach to the question of omitted addresses is applauded by Wright and Summers in their treatise, Uniform Commercial Code, 843 (1972). See also, *In re Bankrupt Estate of Smith*, 508 F.2d 1323 (5th Cir. 1975); *Silver v. Gulf City Body & Trailer Works*, 432 F.2d 992 (5th Cir. 1972); *In re Bennett*, 6 U.C.C. Rept. Serv. 551 (W.D. Mich.1969); *In re Bengston*, 3 U.C.C. Rept. Serv. 283 (D. Conn. 1965).

In the *Rooney* case, a complete omission of both addresses was held to be a minor error, not seriously misleading. The Krueger agreement is much more informative: it narrows the location of both parties to Bannock County; it provides the name of the notary who declares to know both parties; it gives also the name and address of the attorney who was hired by one or both of the parties to draft the agreement; and it gives a four page metes and bounds description of the ranch of the Cammacks.

One final citation. In *In re French*, 317 F.Supp. 1226 (E.D.Tenn.1970), the court was faced with a situation the equities of which are profoundly similar to those facing us here. Like the Kruegers, the petitioner there had a questionably adequate filing. The general creditors in bankruptcy there, like the Whitworths here, argued that a defective filing rendered the security agreement unperfected. The result, if their argument had won the day, would have been *a windfall to parties who had never relied to their detriment upon the defective filing.* The court declined to rule the security interest unperfected, in language most applicable here:

"The Court is unable to find any prejudice to creditors. It is admitted that none of the general creditors made inquiry of the Secretary to ascertain what property of the bankrupt was subject to any liens. Invalidating petitioner's security interest would create a windfall for the general

creditors solely because of this slight dereliction. This would be an unjust result. The failure to include the addresses would, at most, have inconvenienced a creditor." *In re French*, supra. 317 F.Supp. at 1228.

\* \* \* \* \* \*

The majority opinion correctly starts by addressing the question of

". . . whether the Kruegers were required to file a financing statement pursuant to Art. 9 of the Uniform Commercial Code in order to protect their interest in the cattle."

The majority concludes, also correctly, that the Kruegers *were* required to perfect their security interest by filing within ten days after possession passed to the Cammacks. Inexplicably, and with no supporting analysis, no case law citations, and no Code references, the majority then concludes that the Kruegers did not perfect their security interest by filing. The reason, apparently, is to be found in the Court's facile reliance on the stipulation of the parties,

"That the Defendants, Herman W. and Josie R. Krueger, did not file a Financing Statement under the Uniform Commercial Code covering any of the animals subject to their Lease with the Cammacks."

In short, the parties have stipulated that the Kruegers did not make the U.C.C.–1 filing, as it is commonly called. But this, as we have seen, is only the start of the inquiry. To jump immediately to the conclusion that the Kruegers' security agreement was not perfected under the requirements of the Uniform Commercial Code is to accept not a stipulation of the parties, but a contention of the plaintiff. The Kruegers themselves made no such stipulation, but rather request the court:

"That even if it should be found that the Defendants' Lease is subject to the provisions of the Uniform Commercial Code, . . . the Court should make a determination as to whether or not under the facts as given, the Lease would as a matter of fact be a security transaction."

These transactions, it should be remembered, were both made when the Code was as yet in its infancy here in Idaho. In laying out its authoritative interpretation of the Code, this Court should not feel bound by the erroneous contentions of the parties, any more than it is bound by the erroneous conclusions of law of a trial court.

IV. TO DIVEST THE KRUEGERS OF THEIR COLLATERAL FOR SUPPOSED NON–COMPLIANCE WITH A CODE PROVISION, IS TO EXACT A FORFEITURE FROM THE KRUEGERS AND TO UNJUSTLY ENRICH THE WHITWORTHS.

If it were clear that the Whitworths had a validly perfected security interest; and if it were clear that the Whitworths' agreement contained a valid after-acquired property clause; and if it were clear that the Kruegers had not perfected a purchase money security interest . . . then the task of this Court would still not be at an end. We would still be faced with the final stark question: Under such facts, who should prevail? I would suggest that the answer is not simple.

The Florida Supreme Court was presented with precisely this dilemma in the case of *International Harvester Credit Corporation, et al, v. American National Bank*, 296 So.2d 32 (Fla.1974). The Bank had a security agreement with the debtor, Machek Farms, Inc., which agreement took as security all the debtor's after-acquired property. The debtor later bought farm machinery pursuant to a retail installment contract which was eventually held by International Harvester Credit Corporation. I.H.C.C.'s interest, admittedly, would have been a purchase money security interest were it not for the fact that it was filed outside of the 10 day limit specified in the Code. The court of appeals ruled that because of this late filing the farm machinery was free and clear of I.H.C.C.'s lien and subject to the security interest of the Bank as after-acquired property. Judge Rawls, quoting from Mr. Bumble, dissented:

"The law is an ass. This aphorism is especially applicable to the instant facts for by detailing various provisions of the Uniform Commercial Code the majority has reached an illogical result. . . . To permit the bank under these facts to replevy the subject farm machinery from (I.H.C.C.), in my opinion, constitutes legal larceny." 269 So.2d 726, at 731–32.

On certification of the identical question, the Florida Supreme Court, agreeing with the Rawls dissent, amplified:

"It would be abhorrent to equity and justice that the earlier creditor should acquire the subsequent *creditor's* property or 'interest' in this manner. . . .

"Logical and traditional equitable reasons preclude a result which would allow the bank as mortgagee to subject the after-acquired farm equipment as its collateral, while not changing its position and giving no "new value" because of the later sale of equipment; consequently, the bank was not misled by the failure of the seller of the equipment to record his purchase money security.

"To give the prior creditor the seller's retained interest in such property simply because of such seller's failure to record and to permit the original creditor to replevin the sold equipment would be to give to such earlier creditor a windfall not favored by the code (see § 679.108 and U.C.C. Comment 19C F.S.A. 198) contrary to established principles." 296 So.2d at 34–35.

The Florida Supreme Court's conclusion has been much maligned by the law reviews. The litany of objections was predictable. The court's decision, it is said, diverges from the conclusions reached by other courts—thus undermining the uniformity of the Uniform Commercial Code. It resurrects such pre-Code archaisms as "title," and "equitable interest," etc. It shows disrespect for the Code by not penalizing those who fail to comply with the letter of its filing system. Finally, it tampers with the seamless web of the Code, threatens all other parties who may take the records at their face value only to find later that I.H.C.C. had a purchase money security interest in the collateral, and forces confused creditors into wasteful and duplicative expenditures in collecting according to the provisions of 9–501, et seq. *See*, Case Comment, 3 Fla. St. U.L.Rev. 150 (1975); 26 Case W.Res.L.Rev. 708 (1976).

Perhaps there is some validity to these criticisms. Surely, they would be valid if the contest were between I.H.C.C. and a *subsequent* creditor who had relied to his detriment upon the existing state of the records only later to be apprised of "Old MacDonald's Secret Lien"—as it was called by one commentator. *Note*, 27 Univ. of Fla. L.Rev. 151 (1974). Moreover, it is hard to be sympathetic when an industrial giant such as I.H.C.C. fails to comply with the routine recording requirements of its own business.

But, it is much doubted that the draftsmen of the Code—preoccupied with the rights of competing banks, commercial lenders, and inventory financers—ever gave any thought to the possibility that one of two purchase money vendors would be awarded the other's collateral because of the latter's failure to file properly. No such example is set forth in the text or the Comments to I.C. § 28–9–312(3), (4), (5). Comment 3 to I.C. § 28–9–204 speaks only of the "commercial borrower" and it is undoubtedly in the world of the institutional lender that the after-acquired property device finds its proper setting.

The Whitworths were not a lender, but a seller; the Cammacks were not their borrower, but their buyer. Cammacks, as with all persons in business, undoubtedly had a commercial lender from whom they were "borrowers." The agreement between Whitworths and Cammacks, by contrast, was obviously intended to be only a purchase money security agreement. It was to serve as a shield *to protect* the Whitworths, not as a sword with which to attack any later vendor's cattle, other than mere "replacements" for their own. Hence it contains none of the after-acquired phraseology that invariably finds its way into commercial financing documents. If the par-

ties had bargained for such, the attorney would surely have written it in. Everyone seems to have recognized that it was not a situation properly calling for any such provision.

By surrendering the Kruegers' collateral to satisfy Whitworths' lien, the majority is exacting a forfeiture, a five-digit penalty, pure and simple. It is the long-standing policy of Idaho courts that forfeitures are not favored either in law or in equity. *See, Graves v. Cupic,* 75 Idaho 451, 272 P.2d 1020 (1954), its predecessors and its progeny. This policy has been expressly incorporated into the Code. I.C. § 28–1–106(1). If one asks in what manner the Kruegers offended the rights of the Whitworths so as to merit such a penalty, no answer is forthcoming. Indeed, the penalty could not arise out of any relationship of the Whitworths and the Kruegers; there was none. Rather, it is the result of an explicit balancing which concludes that one rancher should be sacrificed so that the nation's Uniform Sacred Cow may remain whole.

Unfortunately, the majority is more in awe of the Code than were its drafters who, according to Professor Gilmore, never intended that its enactment would

"... announce the arrival of the millenium. The Code is, in my opinion, a good statute; it is not a perfect one. I see nothing to be gained, and much to be lost, by a pretense that it is either more or better than it is."

I Gilmore, Security Interests in Personal Property, Preface, at x (1965).

Professor Gilmore notes that it is the *explicit* policy of the Code that it not be applied blindly and mechanically.

"The present point is that the Uniform Commercial Code, so-called, was not designed, as the European Codes may have been, to abolish the past, even on the level of semantics or vocabulary. In a provision which reproduces in slightly different form one found in all the earliest Uniform Acts in the commercial field, the Code says (1–103):

" 'Unless displaced by the particular provisions of this Act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.' "

"Even on its own terms, then, *the Code does not purport to contain all the law there is. . . .*

"Answers will be provided to questions such as these. Many of the answers will come in the form of amendments to the present text of the Code. *Others will come from the more leisurely process of judicial decision.* Paradoxically, it is at this point—in devising appropriate solutions to problems that have only recently become identifiable—that a knowledge of the past becomes most helpful, both to the legislative draftsman and to the judge." Ibid. at viii-ix.

If this principle of flexible application is valid for the Code as a whole, it is all the more important when dealing with the most controversial of all Code policies, namely, those which concern the "floating lien." Again, Professor Gilmore is far less deferential than is the majority of this court:

"Therefore, rather than pretend, on the level of legal fiction, that things cannot be done which in fact and law can be done, *sound analysis requires that the floating lien be recognized as valid and then cut down to size in situations where its unlimited and unrestricted application might lead to undesirable or unjust results.*" (Emphasis added.) Gilmore, pp. 360, 361.

Where the Florida court was faced with a head-on collision between a prior creditor with a fully perfected security interest in after-acquired property and a later creditor who was guilty of a clear-cut failure to record his purchase money security interest, it could not bring itself to pronounce the inequitable decision others say is seemingly mandated by the Code.

This Court is faced with no such hard choice. We should hold here today, that, if it were necessary to reach the question, a

prior purchase money secured vendor, even one with a valid after-acquired property clause, should take after a later purchase money secured vendor, even one with a defective filing. The defective filing has done nothing to mislead the prior creditor. To forfeit the second creditor's collateral as a penalty for his defective filing is to unjustly enrich the prior vendor. In short, it is a windfall. Such an outcome may seem unobjectionable in the aseptic world of law review articles; it should otherwise be regarded in non-academic situations where real live parties are entitled to judicial determinations bottomed on justice and conscionability.

A lien on after-acquired property has no place in the ordinary purchase money security agreement; it is an institution lender's device, and to such loan transactions I believe it should be properly confined.

V. ADDENDUM.

A brief comment with regard to the special concurring opinion of the Chief Justice. I was convinced when I wrote the foregoing dissent that the views I expressed therein were correct, and were wholly within the purview and intent of the Uniform Commercial Code; I am now more convinced than ever.

It is important to remember what this case is all about. When the Whitworths sold to the Cammacks, they sought to retain a lien on the 98 head which they were selling, and the agreement specified that if any of these animals were disposed of, the lien should attach to the replacements. When the Cammacks ended up in the bankruptcy court, and all of the Whitworth herd was gone but three animals, the Whitworths turned to the Krueger cattle as a source from which to make good their loss.

Suggestively, the specially concurring opinion makes the statement that "the word 'replacement' appears to be commonly used in the creation of livestock after-acquired rights," and cites three cases, beginning with *United States v. Pete Brown Enterprises.* These cases are not to that point; the "replacement" language in each

of those cases occurs in and is encompassed by such all-inclusive *after-acquired* provisions as:

"All livestock . . . now owned or hereafter acquired by Debtor, together with all increase, replacements, substitutions and additions thereto." *U.S. v. Pirnie,* 339 F.Supp. 702, 705 (D.C. Neb.1972). *And see, U.S. v. Pete Brown Enterprises, Inc.,* 328 F.Supp. 600, 602 (N.D. Miss. 1971); *Erb v. Stoner,* 1 UCC Rep. 469, 470 (Pa.Ct.Comm.Pl.1959); *Burlington Nat. Bank v. Strauss,* 50 Wis.2d 270, 184 N.W.2d 122, 123 (1971).

I have no quarrel with the adequacy of such language to give subsequent creditors full notice of a lien on after-acquired property. The absence of such language is precisely what I find objectionable in the present attempt to transform the Whitworth's narrow replacement clause into the after-acquired property clause required by the Code.

I do not have any trouble agreeing with the following statements out of the specially concurring opinion:

"Replacement . . . 'means cattle brought in to maintain herd size, as opposed to additions.'

" . . . cattle farmers do not buy 50 head of new cattle to replace lost friends. 'Replacement' as it is used in the livestock context more probably refers to stock acquired to maintain herd size when other stock is lost from the herd. . .

"In this sense, it is important to realize that 'after-acquired' is *not* freely interchangeable with 'replacement.'"

In this case, however, the record does *not* establish that the Krueger cattle were replacements for the Whitworth cattle. The record does *not* establish that the Cammacks somehow "lost" 50 head of what had been initially Whitworth cattle, or that they somehow "lost" what would have been four years of new heifer increase out of that original 98 head, and, moreover, the increase of the increase. It is not a proper function of an appellate court to indulge in the assumption that the Cammacks ac-

quired the Krueger cattle as replacement for the Whitworth cattle, nor to assume in the first place that the original 98 head were lost, or even that 50 were lost, and that all of the increase were lost as well.

That all but three of the Whitworth cattle were gone is not open to question. It is also not open to question that the *Whitworth security agreement conferred upon the Cammacks the right to sell* cows, heifers, and calves out of that herd. This constituted consent to sell in the ordinary course of business, and as to vendees purchasing from the Cammacks, the lien of the Whitworth agreement and filing statement was waived. I.C. § 28–9–306(2); *Swift & Co. v. Jamestown National Bank*, 426 F.2d 1099, (8th Cir. 1970). This, I submit, compounds the injustice being done to the Kruegers. Purchasers from the Cammacks, making off with almost the entire herd of the Whitworths, were wholly protected from suit by Whitworths for two reasons, one, the impossibility of identification, and two, the waiver of the lien—all of which suggests to my mind the unconscionability of allowing the Whitworths to then turn to the Krueger cattle, on a claim for which their agreement with Cammacks made no provision.

The specially concurring opinion is willing to make the further assumption "that the lease was not filed with financing statements, and a creditor looking for security interest by checking financing statements would not find the lease." We don't know that this is so. Not that it *may* not be so, and likely is so, but we do not know that from this record, and I wonder how far an appellate court should go in making assumptions, especially where the case comes before this Court on facts stipulated to by the parties involved.

We *do know* that the Code provides:

"Presentation for filing of a financing statement and tender of the filing fee or acceptance of the statement by the filing officer *constitutes filing under this chapter.*" (Emphasis added.) I.C. § 28–9–403(1)

And we know that Krueger document was presented, and the filing fee paid.

What is further known for certain is that anyone who contemplated dealing with the cattle on Cammack's ranch, either as buyer, or lender, in checking the courthouse filings, in an exercise of ordinary prudence would check for leases as well as for security agreements. It should not be forgotten that there are leases which are *not* by law construed as security agreements, and any buyer from or lender to Cammacks, taking cattle as security, would thus be finding the Krueger agreement and the information it contains.